SHELDON KNOWLTON, Appellee, v. HENRY BAUMHOVER et al.,
Appellants.

SCHOOLS AND SCHOOL DISTRICTS:   Public School Funds—Ap-
1   propriation for Sectarian Purposes.  The carrying on with pub-
    lic school funds of a public school, in conjunction with, and
    as a part of, a parochial school, devoted in part to sectarian
    teaching, is wholly illegal, and no lapse of time, and no ac-
    quiescence of the people therein, will give it validity.  (Art. 1,
    Sec. 3, Const.; Sec. 593, Code, 1897.)

    PRINCIPLE APPLIED:  A two-story, two-room building, ad-
    joining a Catholic church, was used as a Catholic school.
    Grades from one to five, inclusive, were taught in the lower
    room.   Grades from six to eight were taught in the upper
    room.   Two sisters of the Catholic order presided over the
    school, the sister in the upper room being the directing head.
    These sisters always wore the characteristic garb of their order,
    and gave daily instruction in the school, in secular learning
    and in the principles of the Catholic religion.  Religious pic-
    tures, distinctly appealing to those of the Catholic faith, adorned
    the walls of the school room.
    The public school board, on the claim that the public school
    building was "inadequate," and that "expense would be saved,"
    rented, of the Catholic priest in charge of the church and school,
    for public school purposes, and for ten years, and for a merely
    nominal rental, the upper room of said parochial school build-
    ing.   Thereafter, the *lower* room of said building was, admit-
    tedly, at all times continued as a sectarian or parochial school.
    It was claimed that the *upper* room became a *public* school.
    The school board regularly employed, as a teacher in charge of
    said upper room, the sister already in charge thereof, and the
    public school funds were used to pay her and to meet the other
    expenses attending the rental agreement.  The nominal rental
    was never demanded and never paid.  Nonresident pupils at-
    tended the school in the upper room, without payment of tui-

'tion to the school district. No regrading of the school was had. It continued as *one* school, of two departments.. Some "understanding" seems to have existed that pupils in grades *one to five* might demand admittance to the *upper* room, and thereby avoid attending the admittedly parochial school on the lower floor; but it did not appear that any such grades were ever taught in the *upper* room. The admixture of secular and religious instruction was continued, in the upper room, after the rental arrangement was entered into, and until complaint was made of the religious instruction, when such instruction was discontinued *in the upper school room*, and such instruction was thereafter given, each morning, by the priest *in the adjoining church building;* but non-Catholic children were not compelled to attend at the church.

*Held,* the school in the upper room was a sectarian school, and public funds might not be legally appropriated to maintain the same.

EVIDENCE: Relevancy, Competency, and Materiality—Public or Sectarian Character of School. Whether a school is *public* or *sectarian* is competently reflected (a) by the religious books used, (b) by the religious emblems adorning the walls, (c) by the distinctly religious garb worn by the teachers, (d) by evidence of the religious design and purpose of the building, and (e) by the proximity of said building to the church in question.

INJUNCTION: Public Officers, Etc.—Exercise of Discretion—Abuse —Schools and School Districts. The discretion of a school board to rent quarters suitable for school purposes is not an unbridled discretion. The renting of premises in such manner and under such conditions as to merge the public school into another school which is, in part, devoted to sectarian teachings, is such an abuse of discretion as to open the door to injunctive relief. (See Sec. 2774, Code, 1897.)

SCHOOLS AND SCHOOL DISTRICTS: Government, Officers, Etc.— Illegal Action—Relief—Injunction. Relief from the wholly illegal acts of a school board need not be pursued by appeal to the county superintendent, etc., but may be had by direct resort to the courts. So held where injunction was granted to restrain the merging of a public school with a parochial school and the appropriation of public funds to maintain the same.

PRESTON, C. J., and SALINGER, J., dissent, on the ground that appeal to the department of public instruction was the proper remedy.

INJUNCTION: Decree—Unlawful Appropriation of School Funds— Modification. A decree enjoining a school board from appro-

priating the funds of the district for the support of a sectarian school with which the public school had been combined, and mandatorily commanding the board to provide a school building for the use of the district, and, until such building could be had, to rent suitable quarters, will, on appeal, be modified by omitting the mandatory feature, it being presumed that the board would do its duty.

SCHOOLS AND SCHOOL DISTRICTS: Government, Etc.—Permissible Use of Bible, Etc. Principle recognized that the reading of the Bible or the recital of the Lord's Prayer, without comment, in a public school, is not illegal.

*Appeal from 'Carroll District Court.—*F. M. POWERS, Judge.

JANUARY 18, 1918.

SUIT in equity to enjoin the defendants, directors and officers of a school corporation, from appropriating, contributing, or paying out public school funds for the support, or in aid of the maintenance or support, of a parochial school, and for other equitable relief. The defendants denied the allegations of the petition; and, on trial to the court, a decree was entered substantially as prayed, and defendants appeal.—*Affirmed.*

*Reynolds & Meyers,* for appellants.

*Sims & Kuehnle,* for appellee.

WEAVER, J.—Maple River Township District is a school corporation of Carroll County. One of its subdistricts includes a small village bearing the name Maple River, and is spoken of in the record as "Maple River District," or "Maple District," and sometimes as "No. 4." For many years prior to March, 1905, a schoolhouse had been provided for the use of this subdistrict, and a public school regularly maintained therein. At the March, 1905, meeting of the board of directors, a resolution was adopted to the effect that, because of the

1. SCHOOLS AND SCHOOL DISTRICTS: public school funds: appropriation for sectarian purposes.

"inadequacy" of the school building, and for the "saving of expense," it was advisable to rent for school purposes "the north room of the second story of the building standing on Lot 11, Block 7, in the town of Maple River, for a period of ten years at a yearly rental of two dollars and fifty cents and that the president of the board be authorized to enter into such a lease with Joseph Kuemper." This was. done, and the schoolhouse property was sold and disposed of. From that time forward, the only public school, if any, in Maple District, has been maintained in the place described in the lease above mentioned. In the year 1914, this suit was brought by the plaintiff, a resident taxpayer of the district, alleging that the school so maintained is not a public school, within the meaning of the law, but is, in fact, a parochial or religious school, which was established and has been and still is being conducted by and in behalf of the religious organization known as the Roman Catholic Church, and that the board of directors and the treasurer of the district have paid out and expended, and, if not restrained from so doing, will continue to pay out and expend, the public funds of the district for the benefit and support of the said parochial school. Upon this showing, an injunction was prayed, forbidding all such use of the public funds, and for other equitable relief. The answer of the defendants is a denial generally of the allegations of the petition.

The trial court, after hearing the evidence, found for the plaintiff, and entered a decree perpetually enjoining the defendants and their successors in office from using or appropriating the moneys of the district to such end, and commanding the board of directors to provide a school building for the use of the subdistrict, and meanwhile, until such building could be provided, that a suitable room be rented for that purpose elsewhere than in connection with the pa-

rochial school.  From this decree, the defendants have appealed.

I.  While there is dispute at several points concerning certain matters of fact, very much of the testimony, and enough to fairly determine the merits of the case, is either undisputed or thoroughly well established by a clear preponderance of the evidence.  It appears that the school township and subdistrict in question are peopled very largely by families of the Roman Catholic faith, and that parents of that communion prefer, whenever it is possible, that their children be trained or taught in parochial or religious schools of that faith, until they have finished a course which is comparable to that which is covered by the first eight grades in public schools.  A Roman Catholic house of worship, known as the "St. Francis Church," had been erected in that vicinity, and there religious services were regularly conducted by priests to whom the pastoral charge of that parish was, from time to time, committed.  By its side was also erected a building in which a parochial school was maintained.  This building was of two stories, each having a schoolroom.  The teachers in these rooms were Catholic sisters, wearing the characteristic garb and regalia of their order, who gave daily instruction to their pupils, not only in branches of secular learning, but also in the Catholic catechism and in the elementary principles of Catholic faith.  The building as a whole was, to all intents and purposes, a single schoolhouse, and the classes taught therein constituted a single school of two departments, established and maintained for the express purpose of giving religious training to its pupils, and at the same time affording such pupils, as nearly as practicable, the equivalent of a common school education.  Therefore, when we say that the property described in the resolution adopted by the board of directors as the "north room of the second story of the building standing on Lot 11, Block 7, in the town of Maple River," was in

fact the upper room of the parochial school building which we have described, and the nominal lessor, "Joseph Kuemper," was the priest in charge of St. Francis Church, which had the parochial school under its fostering care, the inevitable certainty of this controversy is plainly seen, and should have been visible to the parties to the transaction.

Let us now look briefly into the practical working of the arrangement thus made. Miss Martin, whose religious name is Sister Estella, and who was in charge of the upper room of the parochial school, was employed by the board of directors as teacher of the subdistrict school, and she took charge, or rather she remained in charge, of that room, while the lower room remained in charge of another sister of the same order, who continued to conduct it as an avowedly church school. The pupils in both room were organized and graded after the manner of a single school of two departments, the younger children being taught in the lower room, and the older ones in the upper. From the beginning, and for a period of more than nine years, the study of the Catholic catechism and the giving of religious instruction were part of the daily program of instruction in both rooms. The walls were hung with pictures of the Holy Virgin, of Christ crowned with thorns, of the Crucifixion, and others, all unmistakably appealing to Catholic sentiment, and the teachers were invariably arrayed in the striking robes of their order. Every influence of association and environment, and of precept and example, to say nothing of authority, was thus contrived to keep those of Catholic parentage loyal to their faith, and to bias in the same direction those of non-Catholic parentage. In short, so far as its immediate management and control were concerned, the manner of imparting instruction, both secular and religious, and the influence and leadership exercised over the minds of the pupils, it was as thoroughly and completely a religious parochial school as it could well have been had it continued in name, as well

as in practice, the school of the parish under the special
charge and supervision of the church, its clergy, and relig-
ious orders.   The act of the board in thus surrendering its
proper functions and duties is not to be explained as a
mere change in the location of the public school, or a mere
exercise of the discretion which the law gives to the board
to rent a schoolroom when circumstances render it neces-
sary.   It was a practical elimination of the public school as
such, and a transfer of its name and its revenues to the
upper department of the parochial school.   That the two de-
partments, the so-called public school in the upper room,
and the church school in the lower room, were, in practical
operation, considered and treated as a unit, a single school
of two departments, is demonstrated by their organization
and grading, to which we have already referred.   That Sis-
ter Estella was regarded as the head of this school as an
entirety, and the sister in the lower room as her assistant,
is quite apparent.   Indeed, on at least one occasion, when,
in her alleged capacity as teacher of the public school, Sis-
ter Estella, undertook to make her regular report of the
pupils attending her school, together with other statistics
relating to the school and its work, she included therein
the total number of pupils in both rooms, their average at-
tendance, and other facts and figures relating thereto.   It
is true, the secretary of the board, who came into office after
this report was made, and received it, with other papers,
from his predecessor, to whom it had been delivered by the
teacher, seems to have had an eye to the preservation of ap-
pearances, and wrote upon the document the words, "Not
Accepted;" but by what authority is not explained.   It is
further said by this secretary that he procured the teacher
to make an amended report, omitting therefrom all statistics
except those pertaining to the school in the upper room.
But if those schools were not in fact one and under the same
control, if they were distinct and independent, as is now

claimed, it is quite incredible that the sister in charge, being called upon for a report of her school, could have been led into the blunder of including therein all the statistics of both. She was not produced as a witness, and no attempt is made to explain this inconsistency. It is much easier to believe that, in the honest simplicity of her heart, she made her report in accordance with what she understood to be the simple truth.

But it is argued in support of the appeal that, conceding the impropriety of teaching the catechism and the giving of religious instruction in the school, it was a mere irregularity, which occurred without the knowledge or consent of the board of directors; and that, when the practice became known to them, they caused it to be abandoned. It is simply imposing too great a tax upon human credulity to believe that this school could have been conducted in the manner described for nine consecutive years, and no notice or knowledge thereof have come to the ears of these officers. All of them had, for considerable periods, been members of the board, or held other official positions having to do with the public schools of the township. Some of them had children of their own attending this school. Several of them had served as directors of this subdistrict. The religious character and practices of the school do not appear to have been hidden from the directors under any veil of secrecy, and, assuming that these officers gave any attention whatever to their official trust, they must have known the facts as they existed, as, indeed, they must have been a matter of common knowledge throughout the district. The only explanation compatible with the entire candor of these denials is that, having surrendered the school to the care of the church, the officers cast off all thought of its further care or attention, except to go through the form, from time to time, of contracting with the teachers, and providing for the support of the school from the public funds. That there is

a large grain of truth in this theory is corroborated by the admission in testimony that, during all this period, not one of the directors ever visited the school, or gave to the sister in charge any instruction, direction, or rule with reference to her duties. The nominal rent reserved to St. Francis Church for the use of the schoolroom was never demanded and never paid. Nonresident pupils attended the school without paying tuition to the district. The statement that, upon complaint made, the board ordered a discontinuance of the use of the catechism, is not borne out by the record. There is no showing that the board or any officer or director of the district, even after complaint was made, took any action whatever to interfere with the practice, or gave any order or instruction to the sister in charge of the school to discontinue it. When complaint was made to the board, instead of taking up the investigation officially, it did no more than tell the complaining parties to investigate for themselves, and report again in the future. The county superintendent does say that, when he "heard of the teaching of the catechism in this room," he at once "took measures to prevent it," and that such study was thereafter abandoned. The abandonment spoken of was in the form, rather than in the substance, of the practice by which the school was made a potent factor of religious propaganda. The change adopted was the omission of the catechism from the daily program of exercises, only to be taken up at once in the church building near at hand, where the children were assembled each morning, immediately before the school was open for the day, and there received instructions at the hands of the priest. Conceding, for argument's sake, that such attendance was voluntary, in the sense that no requirement or command was laid upon non-Catholic pupils to attend or take part in such exercises, yet, surrounded as they were by a multitude of circumstances all leading in that direction, impelled by the gregarious instincts of childhood to go with

the crowd, and impressed with a sense of respect for their teachers, whose religious principles and church affiliation were unceasingly pressed upon their notice by their religious dress and strictly ordered lives, could a reasonable person expect the little handful of children from non-Catholic families to do otherwise than to enter the invitingly opened door of the church, and receive, with their companions, the instructions there given? That these conditions show any real or substantial removal of the objectionable features which differentiates this school from the public school provided for by law, we cannot admit. When we speak of these matters as objectionable, it is not because of any danger of injury, moral or religious, to children of another faith, but because they cannot be tolerated in public schools without infringing upon the common right of every citizen, whatever his faith, to rear his own children in his own way, so long as he keeps within the law.

Again, it is argued that this school was approved by the acquiescence or consent of the people of the district; but this is setting up a standard which the law does not recognize. The board of directors had no authority to clothe a religious school with the character of a public school, and no estoppel could arise against the complaint of any patron or taxpayer, simply because of delay in entering his protest.

Again, it is said that the public character of the school was guarded by providing that no child should be required to attend the school in the lower room, and by directing the teacher in the upper room to receive all children of any grade applying for admission, and to give them instructions suited to their several needs. There is not a word of this kind in the records of the board or of the school which have been put in evidence. Some of the directors say, in substance, that such was their understanding; and the county superintendent testifies that, in his talk with the board, he "understood that, *if anyone refused to attend the parochial school,*

he was at liberty to attend the other school, and take work in the regular courses." This statement is a practical, though perhaps unconscious, admission that the general plan of the school was a grading of the pupils in both rooms in such manner as to send the lower grades into the lower room (an admittedly parochial department), and the higher grades into the upper room, except when such plan was interrupted by the refusal of a young child to conform thereto, an exception which may well be dismissed as being a very negligible possibility. There is no evidence that any pupil below the sixth grade was ever taught in the upper room. The county superintendent himself says that, when he visited this room, he found Sister Estella teaching the sixth, seventh, and eighth grades; and, if it ever occurred to his supervisory discretion to inquire into the absence of the younger pupils who, as a rule, constitute the larger part of every public school, he does not mention it.

It is also not without a bearing on this phase of the case that, before the leasing of the parochial building of which we have spoken, the attendance at the parochial school was so general as to materially deplete the attendance at the public school; but when the change was made, the attendance was very largely increased, and soon thereafter, the compensation paid to Sister Estella was increased from $56 to $70 per month. Two of the directors testify that this advance was made to enable this sister to divide her salary, in some proportion, with the sister who taught in the lower room. This is denied by others of the directors, while still others say they heard nothing of that kind. Neither of the teachers who could have settled the truth of this dispute was called as a witness. But whatever the truth may be in this particular instance, it is an illuminating circumstance that, when the public school had been metamorphosed or reorganized into the school in the second story of the parochial building, under the auspices and organization which

we have described, the objections which had led the supporters of the parochial school to found and maintain it at their private expense, and to withdraw or withhold their patronage from the public school, were somehow obviated; and the so-called public school became the recipient of the favor and confidence which it had before been denied. That these patrons had abandoned or renounced their religious scruples is scarcely to be believed; but, if they accepted the school conducted by Sister Estella as affording their children all the advantages of religious training for which they formerly relied upon the parochial school, then their conduct is not only easily understood, but their conclusion in this respect was a reasonable deduction from the admitted and proven facts.

In short, it must be said that, with the abandonment of the public schoolhouse, and the transfer of the school into the parochial building, and its organization and conduct as there perfected, the school ceased to have a public character, in the sense contemplated by our laws, and became, has since been, and now is, a religious school, maintained and conducted with a special view to the promotion of the faith of the church under whose favor and guardianship it was founded.

II. Appellants misconceive the nature and purpose of this action when they undertake to treat it as a mere objection to the employment of a sister of charity as teacher in a public school, or to the fact that such teacher arrays herself in the peculiar garb of her order, or to her practice of reading the Bible or repeating the Lord's Prayer in the presence of her school. The objection goes far deeper than that. The substance and effect of the complaint made by plaintiff is that a particular public school has been perverted into a sectarian or religious school, contrary to the laws of our state, and that the de-

2. EVIDENCE: relevancy, competency and materiality: public or sectarian character of school.

fendants, in their official capacity, are unlawfully appro-priating the public funds to its support. The charge being denied, the plaintiff properly put in evidence such facts as he was able to develop having any legitimate tendency to disclose the real nature and character of the school in ques-tion. Among these circumstances were not only the study of the Catholic catechism, but also the display of emblems of the Catholic faith, the giving of religious instruction, the use of the Catholic prayer-book, the design and purpose of the parochial building for which the public schoolhouse was abandoned, the immediate proximity of the church, where the children assembled to be taught by the priest, the re-ligious dress in which the teachers were arrayed, together with other pertinent facts from which the court could de-termine whether this was, in fact, an ordinary public school, from which all sectarian instruction and influence were strictly excluded, or had been transformed into an efficient instrument of promoting and extending the work and in-fluence of the church. That these are proper matters of evidence, affording light upon the issues thus joined, is not only manifest to every person of common observation and common sense, but also, as we shall show in another para-graph of this opinion, they have been so treated by the courts, over and over again. The law does not prescribe the fashion of dress of man or woman; it demands no religious test for admission into the teacher's profession; it leaves all men to worship God or to refrain from worship accord-ing to their own consciences; it prefers no one church or creed to another. This principle of unfettered individual liberty of conscience necessarily implies—what is too often forgotten—that such liberty must be so exercised by him to whom it is given as not to infringe upon the equally sacred right of his neighbor to differ with him. To that end it is fundamental that the law itself shall be free from all taint of discrimination, and that the state shall be watchful

to forbid the use or abuse of any of its functions, powers, or privileges, in the interest of any church or creed. Nowhere is such abuse more likely to manifest itself than in our system of public schools, and it is not strange that the average parent is peculiarly sensitive concerning the influences there brought to bear upon his children. If there is any one thing which is well settled in the policies and purposes of the American people as a whole, it is the fixed and unalterable determination that there shall be an absolute and unequivocal separation of church and state, and that our public school system, supported by the taxation of the property of all alike—Catholic, Protestant, Jew, Gentile, believer, and infidel—shall not be used, directly or indirectly, for religious instruction, and above all, that it shall not be made an instrumentality of proselyting influence in favor of any religious organization, sect, creed, or belief. So well is this understood, it would be a waste of time for us, at this point, to stop for specific reference to authorities or precedents, or to the familiar pages of American history bearing thereon.

There is no such thing as a universally accepted religion, and differences of opinion and thought along these lines have developed an almost numberless variety of churches, societies, and other voluntary organizations, each dedicated to the promotion of the peculiar views of its adherents. We speak of these diverse bodies as sects; and, while the word "sectarian" is sometimes used as a term of reproach, there is a very just and inoffensive sense in which it may be said that every religionist is a sectarian; for, believing that he is right, and that his conception of the true relation between man and God is correct, he is conscientiously impelled to promote that faith by precept, example, and leadership. The idea that it is a proper function of government to assume authority in matters of religion, and lend the powers of sovereignty to its advancement, was once quite general, with the result that the union of the state

with the particular church which happened to be in the majority developed conditions so destructive of natural rights and individual liberty as to become the prolific occasion of revolution and bloodshed. To that cause more than any other, we owe the settlement of this country by fugitives from religious persecution, and the foundation and development of a government here on the theory of an absolute divorce between civil and ecclesiastical affairs. The right of a man to worship God, or even to refuse to worship God, and to entertain such religious views as appeal to his individual conscience, without dictation or interference by any person or power, civil or ecclesiastical, is as fundamental in a free government like ours as is the right to life, liberty, or the pursuit of happiness. Included in that sacred right is that of the parent to instruct and guide his own children in religious training. He has no right, however, to ask that the state, through its school system, shall employ its power or authority, or expend money acquired by public taxation, in training his children religiously. The same principles which assure to him the right of perfect freedom of conscience in matters of church affiliation and religious belief, forbid the employment of public authority of any kind to impose his views upon his neighbor or his neighbor's children. For like reasons, while withholding from the state all authority in matters of religion, it is no less important that those who are employed in public stations, and especially in public schools, do not make use of the advantages of their position to teach or promote their peculiar religious notions. To guard against this abuse, most of our states have enacted constitutional and statutory provisions, forbidding religious exercises and religious teaching in all public schools, and all use or appropriation of public funds in support of sectarian institutions. These provisions have varied somewhat in form of expression, but their clear purpose and intent, when construed in

the light of our history and development as a people, are.
for the most part, quite similar.    In this state the Constitu-
tion (Article 1, Section 3) forbids the establishment by law
of any religion or interference with the free exercise there-
of, and all taxation for ecclesiastical support.   We have also
a statute forbidding the use or appropriation or gift or loan
of public funds to any institution or school under ecclesias-
tical or sectarian management or control (Code Section
593).   As we understand appellants' theory, they do not
deny the general correctness of this statement of the law,
but rest their contention solely upon the proposition that
the facts in this case do not justify the finding that the
school in question is sectarian, or that it has been or is
now a religious school, as distinguished from a public school
under the laws of the state.   If there be any mental reserva-
tion on either side of this discussion upon the definition of
"sectarianism," the court cannot consider it.   Neither Catho-
lic nor Protestant can be heard to say, "We are not a sect,
and our teaching is, therefore, not sectarian; for we alone
are the Church."   That is a field of polemics into which the
law and the court may not enter.   At the bar of the court,
every church or other organization upholding or promoting
any form of religion or religious faith or practice is a sect,
and to each and all alike is denied the right to use the pub-
lic schools or the public funds for the advancement of re-
ligious or sectarian teaching.   To constitute a sectarian
school or sectarian instruction which may not lawfully be
maintained at public expense, it is not necessary to show
that the school is wholly devoted to religious or sectarian
teaching.   In *State v. District Board of Edgerton,* 76 Wis.
177, the court reached a decision somewhat at variance with
our decision in *Moore v. Monroe,* 64 Iowa 367, on the sub-
ject of Bible reading in the public schools; but its general
discussion of the subject of religious and sectarian teaching
covers the whole field of controversy on these subjects in a

very able and convincing manner. Among other things, it says:

"The mere fact that only a small fraction of the school hours is devoted to such worship, in no way justifies such use against an objecting taxpayer. If the right be conceded, then the length of time so devoted becomes a matter of discretion. If such right does not exist, then any length of time, however short, is forbidden. The relators, as taxpayers of the district, were compelled to aid in the erection of the school building in question, and also to aid in support of the school maintained therein. Being thus compelled to aid in such erection and support, they have a legal right to object to its being used as a 'place of worship.'"

In *Donahoe v. Richards*, 38 Me. 379, where it was held that the Bible could properly be used "as a reading book and for the information contained in it, as the Koran might be, and not for religious instruction," the court further says:

"The common schools are not for the purpose of instruction in theological doctrines of any religion or any sect. The state regards no one sect as superior to any other, and no theological views as peculiarly entitled to precedence. It is no part of the duty of the instructor to give theological instruction, and if the peculiar tenets of any particular sect were so taught, it would furnish a well-grounded cause of complaint on part of those who entertain different or opposing sentiments."

The Nebraska court had occasion to consider the same question in *State v. Scheve*, 65 Neb. 853 (91 N. W. 846), and again in the same case in 93 N. W. 169. There it was held, in substantial accordance with our holdings in *Moore v. Monroe*, supra, that the prohibition of religious and sectarian instruction does not necessarily exclude the Bible from the public school, but it does "deny the right to use it for the purpose of imparting sectarian instruction. *   *   * The

point where the courts may rightfully intervene, and where they should intervene without hesitation, is where legitimate use degenerates into abuse,—where a teacher employed to give secular instruction has violated the Constitution by becoming a sectarian propagandist." In that case it was shown that the teacher, as a part of the daily program, led the school in brief religious exercises, such as reading passages of her own selection from the King James version of the Bible, singing religious songs, and offering prayer according to the custom and uses of the so-called orthodox evangelical churches. The teacher, as a witness, said she regarded this part of the program as a religious exercise and an act of worship, though she denied that it was, in any proper sense, sectarian. The court held, however, that it was in violation of the law which exempts every person from attending, erecting or supporting any place of worship against his consent, as well as of the law forbidding the giving of sectarian instruction in any school supported, in whole or in part, at public expense. As an important factor in the situation, the court there calls attention to the laws, in force in most of our states, providing for compulsory attendance upon school by children, and very justly says:

"Unless opinions of universal acceptance in this country since the foundation of our government are at fault, it is a policy of the highest importance that the public schools should be the principal instruments and sources of popular education, because they exert, more than any other institution, an influence promotive of homogeneity among a citizenship drawn from all quarters of the globe. But if the system of compulsory education is persevered in, and religious worship or sectarian instruction in the public schools is at the same time permitted, parents will be compelled to expose their children to what they deem spiritual contamination, or else, while bearing their share of the burden for the support of public education, provide the means from

their own pockets for the training of their offspring else-where. It might be reasonably apprehended that such a practice, besides being unjust and oppressive to the persons immediately concerned, would, by its tendency to the multiplication of parochial and sectarian schools, tend forcibly to the destruction of one of the most important, if not indispensable, foundation stones of our form of government."

On rehearing of the cause, the court, adhering to the views formerly expressed, says further:

"In this country it has been the constant policy of government to unite the people, to bring them closer and closer together, to dissipate race and religious prejudices, and to fuse their sentiments and aspirations. One of the means to accomplish this end was to give all religious sects a free field and no favors. So far as religion is concerned, the *laissez faire* theory of government has been given the widest possible scope. The suggestion that it is the duty of government to teach religion has no basis whatever in the Constitution or laws of this state, nor in the history of our people. The teaching of religion would mean teaching the system of faith and worship of one or more of the religious sects. It would mean sectarianism in the public schools, and to, put sectarianism into the public schools would, according to the opinion prevailing when the Constitution was ratified, be to put venom into the body politic."

The same general question was thoroughly considered and discussed in *Board of Ed. of Cincinnati v. Minor*, 23 Ohio St. 211. There the board of education adopted a rule forbidding religious instruction and the reading of religious books in the common schools of the city of Cincinnati, and suit was brought to enjoin its enforcement. After refusing an injunction, and stating more or less technical reasons therefor, the court enters upon a broader discussion, in support of the theory that religious instruction in our public

schools is wholly incompatible with our theory of free government. It says:

"True Christianity asks no aid from the sword of civil authority. It began without the sword, and wherever it has taken the sword, it has perished by the sword. To depend on civil authority for its enforcement is to acknowledge its own weakness, which it can never afford to do. It is able to fight its own battles. Its weapons are moral and spiritual, and not carnal. * * * True Christianity never shields itself behind majorities. * * * Legal Christianity is a solecism, a contradiction of terms. When Christianity asks the aid of government beyond mere *impartial protection,* it denies itself. * * * The state can have no religious opinions; and if it undertakes to enforce the teaching of such opinions, they must be the opinions of some natural person or class of persons. If it embarks in this business, whose opinion shall it adopt? * * * Let the state not only keep its own hands off, but let it also see that religious sects keep their hands off each other. Let religious doctrine have a fair field and a free intellectual, moral and spiritual conflict. The weakest,—that is, the intellectually, morally and spiritually weakest,—will go to the wall, and the best will triumph in the end. This is the golden truth which it has taken the world eighteen centuries to learn, and which has at last solved the terrible enigma of 'church and state.' * * * The state will impartially aid all parties in their struggle after religious truth by providing means for the increase of general knowledge, which is the handmaid of good government, as well as of true religion and morality. It means that a man's right to his own religious convictions and to impart them to his own children, and his and their right to engage in conformity thereto in acts of worship toward the Almighty, are as sacred in the eye of the law as his rights of person or property, and that, although in the

minority, he shall be protected in the full and unrestricted enjoyment thereof."

In a Pennsylvania case, *Stevenson v. Hanyon,* 4 Pa. Dist. Rep. 395, the complaint charged that, in a certain public school, the daily sessions were opened by the teacher with a religious exercise after the form of worship usually employed in the Methodist Episcopal Church, consisting of responsive readings from the King James version of the Bible, Scripture readings, and hymn singing. It was also alleged that Protestant ministers of the Gospel had been allowed to visit the school and talk to the children upon religious subjects. An injunction against such practices was asked. In overruling a demurrer to this complaint, the court makes the following comment:

"It is too plain for argument that denominational religious exercises and instruction in sectarian doctrine have no place in our system of common school education. They are not only not authorized by any law, common or statutory, but are expressly prohibited and forbidden by our Constitution, the fundamental law of the commonwealth. * * * If it be true, as charged in the bill, that Mr. Haynon is conducting sectarian or denominational religious exercises with the pupils under his charge, whether these exercises be according to the forms of the Methodist Episcopal Church or any other church, he ought to discontinue doing so, and it is the duty of the directors, if the abuse exists, to see that it is eradicated at once."

In New York, under a statute alleged to provide therefor, a certain orphan asylum was about to receive a share of the school fund, on the theory that it was conducting a school in which its wards were receiving instruction after the manner of a common school education. It appeared, however, that the asylum was founded and conducted by the Roman Catholic Church, and that its wards were there being instructed and trained religiously; and payment of the

money was enjoined. In its opinion, the court says:

"If we are to sustain such a claim as this on behalf of a Roman Catholic asylum today, we should probably be called on tomorrow to do the same for a half a dozen Protestant denominations, who may desire to propagate their own peculiar views at the public expense. We do not intend to speak disparagingly of these institutions. In their proper sphere, they are worthy of all praise and legitimate support. * * * If the object of this special legislation is to afford them such education as the state furnishes to all, it may as well, and better, be obtained through the ordinary channel. If the object is to furnish them with instructions of a partial or sectarian character, the state ought not, and cannot constitutionally, contribute to such a purpose." *People v. Board of Ed. of City of Brooklyn*, 13 Barb. 400, 408; *St. Patrick's Orphan Asylum v. Board*, 34 How. Pr. 227, 229.

The Illinois court has said:

"The law knows no distinction between the Christian and the Pagan, the Protestant and the Catholic. All are citizens. Their civil rights are precisely equal. The law cannot see religious differences, because the Constitution has definitely and completely excluded religion from the law's contemplation in considering men's rights. The state is not, and, under our Constitution, cannot be, a teacher of religion. All sects, religious or even anti-religious, stand on an equal footing. They have the same rights of citizenship, without discrimination. The public school is supported by taxes which each citizen, regardless of his religion or his lack of it, is compelled to pay. The school, like the government, is simply a civil institution. It is secular, and not religious in its purposes. * * * The Constitution and the law do not interfere with such [religious] teaching, but they do banish theological polemics from the schools and the school districts. This is done, not from any hostility to religion, but because it is no part of the duty of the state to teach religion,—to take the money

of all and apply it to teaching the children of all the religion of a part only." *People v. Board of Education*, 245 Ill. 334.

In New York, the question of the propriety of a school teacher's wearing the unusual dress adopted exclusively by adherents of one religious faith, while discharging her duties in the schoolroom, was brought by appeal before the state superintendent of public instruction; and, on the theory that such practice constitutes sectarian influence, and ought not to be permitted, it was decided that the school directors should require the teachers to discontinue the practice, while engaged in their work. The teachers refusing to comply with this decision, the matter became the subject of consideration by the courts, in a suit brought to collect the wages of such teachers during the time they were in contempt of the superintendent's order. The Constitution of that state provides, substantially in the words of our statute, that neither the public property nor credit nor money may be used, directly or indirectly, in the aid of any school wholly or in part under the control of any religious denomination. Applying this provision of the law to the facts above noted, the court says:

"Here we have the plainest possible declaration of the public policy of the state, as opposed to the prevalence of sectarian influences in the public schools. The regulation established by the state superintendent of public instruction, through the agency of his order in the Bates appeal, is in accord with the public policy thus evidenced by the fundamental law. There can be little doubt that the effect of the costume worn by these Sisters of St. Joseph at all times in the presence of their pupils would be to inspire respect, if not sympathy, for the religious denomination to which they so manifestly belong. To this extent the influence was sectarian, even if it did not amount to the teaching of denominational doctrine."

The court, distinctly refusing to recognize the authority of the majority opinion in *Hysong v. Gallitzin Borough School District,* 164 Pa. 629 (a case which the appellants herein cite and rely upon), adopt and approve the following language from the dissenting opinion by Williams, J.:

"The teachers," when thus arrayed, says the opinion, "come into the school, not as common school teachers or as civilians, but as the representatives of a particular order in a particular church, whose lives have been dedicated to religious work under the direction of that church. Now, the point of the objection is not that their religion disqualifies them. It does not. * * * It is not that holding an ecclesiastical office or position disqualifies them; for it does not. It is the introduction into the schools, as teachers, of persons who are, by their striking and distinctive ecclesiastical robes, necessarily and constantly asserting their membership in a particular church and in a religious order within that church, and the subjection of their lives to the direction and control of its officers." *O'Connor v. Hendrick,* 184 N. Y. 421.

In this Pennsylvania case just noted, it was held by a majority of the court that the mere wearing by teachers of the distinctively religious garb of a particular religious denomination did not constitute sectarian influence, within the meaning of the law, when it did not appear that any attempt was made to impart religious instruction in the school. In view of the conceded facts in that particular case, the conclusion reached by a majority of the court is nothing if not remarkable. In a public school of eight apartments in the town of Gallitzin, the eight teachers were all Catholics. Six of them were Catholic sisters. Instead of being employed in the usual manner, the situations were given only to "such sisters as were detailed for that purpose by the mother superior" of their order. It was further stated by the court that, while it was not proven that the board of di-.

rectors had "resolved" to employ no teachers for six rooms in the public school building except sisters, "in the sense that a resolution had been formally adopted and recorded to that effect," yet, says the court, "it was as clearly established as though spread on the minutes in unambiguous terms that the intention existed to employ none but sisters in certain of the rooms." It was also proven that these teachers were exempted from the usual regulations to which teachers in general were subjected. They did not submit to public examination as to their qualifications, but a complaisant county superintendent called upon them at the "mother house," to afford them a private examination. When the schools adjourned for the holding of teachers' institutes, the sisters did not attend; but retired to the mother house. On "days of obligation or holidays," according to the Catholic calendar, their schools were closed. In school, as elsewhere, they invariably wore the distinctive garb of their order, together with crucifix, rosary, and girdle. In each room, immediately after school hours, the children of Catholic parents were expected to remain and recite the catechism, and receive religious instruction. Between terms of the public school, the sisters used the rooms for private free schools, in which religious instruction was given. The sisters' contracts were signed by them in their religious names, and not in their family names. In entering their religious life, these sisters had taken vows of obedience and poverty, and their earnings were paid to the mother superior or the sister in charge of the house to which they had been assigned under the rules of their order. Children of Protestant parents objected to attending the schools taught by the sisters, but their objections were overruled, and they were compelled to yield, on pain of expulsion. The majority of the court, upon these admitted facts, sustained the trial court in enjoining the teaching of the catechism and the giving of religious instruction in the school buildings, but held

that the showing was insufficient to prove that the conduct of the school proper was sectarian, in any objectionable sense. If the admitted facts there being considered do not clearly and emphatically show those schools to have been under sectarian domination, and permeated throughout by an all-pervading sectarian influence, it would be interesting indeed to know what proof would be regarded as sufficient to establish such fact. We unite with the New York court in the view that the opinion by Williams, J., is more nearly in accord with the true spirit and principle of the law. Among other things, and after setting forth some of the facts here mentioned, that jurist very pertinently says:

"The eight teachers are members of the same church or sect. This is unusual, but not unlawful. Six of the teachers presiding over six departments are nuns of the Sisterhood of St. Joseph. They have renounced the world, their own domestic relations, and their family names. They have also renounced their property, their right to their own earnings, and the direction of their own lives, and bound themselves by solemn vows to the work of the church, and to obedience to their ecclesiastical superiors. They have ceased to be civilians or secular persons. They have become ecclesiastical persons, known by religious names and devoted to religious work. Among other methods by which their separation from the world is emphasized, and their renunciation of self and subjection to the church is proclaimed, is the adoption of a distinctively religious dress. This is strikingly unlike the dress of their sex, whether Catholic or Protestant. Its use at all times and in all places is obligatory. They are forbidden to modify it. Wherever they go, this garb proclaims their church, their order, and their separation from the secular world, as plainly as a herald could do, if they were constantly attended by such a person. The question presented in this state of facts is whether a school which is filled with religious or ecclesiastical persons as

teachers, who come to the discharge of their daily duties wearing their ecclesiastical robes, and hung about with rosaries and other devices peculiar to their church and order, is not necessarily dominated by sectarian influences, and obnoxious to the spirit of the constitutional provisions and the school laws. This is not a question about taste or fashion in dress nor about the color or cut of a teacher's clothing. * * * It is deeper and broader than this. It is a question over the true intent and spirit of our common school system, as disclosed in the provisions referred to. If this is a proper administration of the school laws in Gallitzin, it would be equally so in any other school district of the state, and if every common school was presided over by ecclesiastics, in their distinctive ecclesiastical robes, supplying pupils with copies of their church catechism on application, and teaching it. before and after school hours, to all who chose to remain for that purpose, it seems to me very plain that the common schools would cease to be such, and would become, to all practical intents and purposes, parochial schools of the churches whose ecclesiastics presided over them.  *   *.   * The common schools are supported by general taxation. The Catholic and the Protestant, the Jew and the infidel, help support them, and have an equal right to their benefits. The common school cannot be used to exalt any given church or sect, or to belittle or override it; but they should be like our political institutions, free from ecclesiastical control and from sectarian tendencies."

That this discussion by Mr. Justice Williams accords with great weight of authority is readily seen, not only in the precedents to which we have already referred, but in others, as well. For example, the state of Illinois, by constitutional and statutory provision, forbids payment of any moneys from public funds for the support or aid of any school controlled by a church. A school was founded under the name of "Chicago Industrial School for Girls," and to

this institution the courts were authorized by statute to commit the custody of delinquent girls. As a matter of fact, it subsequently appeared that this school existed on paper only, and served merely as a clearing house, or medium which received the girls committed to its custody, and passed them over immediately to two institutions where religious instructions were given by Catholic sisterhoods. The expense thus nominally incurred by the Chicago Industrial School for Girls was charged by it to the county, and payment of such bills was contested, on the theory that the instruction so given was sectarian or religious, and could not lawfully be paid for from public funds. In support of the claim of the school, it was urged that religious instruction was given to Catholic children only; but the court notes the fact that the teachers and persons in charge were all Catholics, and that the sisterhoods were in complete command of all the school activities, and, as evidence of the sectarian character of the institution, points out that "all the paraphernalia of the church—pictures, graven images, candles, crucifixes, crosses—were met at every quarter, in every passageway, in the school room, on the desks, on the walls,— everywhere." The court held that such school was clearly sectarian, and could not lawfully be supported or aided by public funds, even in the form of payment for tuition given to the children. The opinion says:

"The women whose names are written in this record are animated by the purest of motives. * * * We agree with counsel for appellee that they do their work faithfully and well. It is so shown by the proofs. But it is none the less true that, by command of the Constitution, no county 'shall ever * * * pay, from any public fund whatever, anything * * * to help support or sustain any school * * * controlled by any church.' It is not for us to discuss the wisdom or unwisdom of this prohibition. There it is, couched in terms so emphatic that it cannot fail to chal-

lenge attention.  Any scheme, though hallowed by the bles-
sing of the church, that surges against the will of the people,
as crystallized into their organic law, must break in pieces
as breaks the foam of the sea against the rock on the shore."
*County of Cook v. Chicago Industrial School*, 125 Ill. 540,
562.

Under somewhat similar circumstances, the same doc-
trine has been affirmed in *State v. Hallock*, 16 Nev. 373.  So
also in *Synod v. State*, 2 S. D. 366, it was held, under a like
provision of the law, that payment by the state for tuition
charges in favor of a school under the control of the Presby-
terian denomination could not be enforced, although the ser-
vice so rendered was, by the designation and direction of the
state authorities, pursuant to an act of the legislature, and
although the studies pursued by the students were wholly
secular.  Having more or less bearing in the same direction,
see *State Female Normal School v. Auditors*, 79 Va. 233;
*Otken v. Lamkin*, 56 Miss. 758; *Jenkins v. Inhabitants of
Andover*, 103 Mass. 94.

The authorities to which we have referred show, in the
clearest possible manner, the fixed policy of this nation and
of its several states to maintain the common school system
free from sectarian influence or control, and to preserve the
equal right of every citizen to have his children educated in
these schools of the people without being subjected to the
slightest sectarian leading upon the part of their teachers.
If here and there may be found a case in which, to our
thought, this fundamental principle has seemingly been dis-
regarded, an examination thereof will show, in every in-
stance, that the true principle is not denied, and that the
decision is sought to be justified on the theory that the facts
were insufficient to bring the case within the scope of the
rule.  In a few other cases, where the facts have brought
them dangerously near a breach of the constitutional and
statutory inhibitions, the matter has been glossed over, by

pointing out that pupils objecting to the practice complained of were not required to take part therein, or could be excused therefrom at the request of their parents; and this, in substance, is made a point in this case, in support of the claim that the law has not been violated. This reasoning is very aptly answered by Orton, J., of the Wisconsin Supreme Court, in *State v. District Board of Edgerton*, 76 Wis. 177, as follows:

"It is said that, if reading the Protestant version of the Bible is offensive to the parents of some of the children, and antagonistic to their own religious views, *their children can retire.* They ought not to be compelled to go out of school for such reason for one moment. The suggestion itself concedes the whole argument."

On the same subject, the Louisiana court has said:

"And excusing of such children on religious grounds, although the number excused might be very small, would be a distinct preference in favor of the religious beliefs of the majority, and would work a discrimination against those who were excused. The exclusion of a pupil under such circumstances puts him in a class by himself, it subjects him to a religious stigma, and all because of his religious belief. Equality in education would be destroyed by such act." *Herold v. Parish Board,* 136 La. 1034.

It is worth while, also, to note that, in a large proportion of the cases where the courts have excluded Bible reading and other religious and sectarian exercises and practices from the public schools, the suits have been brought by or on behalf of Catholic complainants, and they have been allowed to prevail solely upon the theory that the law excludes from our public schools *all* religious and sectarian teaching and training, Protestant and Catholic alike; and surely, having invoked the application of this principle, and thereby debarred from the schools those things which savor of Protestant sectarianism, they cannot consistently com-

plain if they are subjected to the operation of the same rule. We concede their right to the relief which has been obtained by them in the cases referred to; for the public school and its benefit are a common heritage, which each and all may enjoy without interference by the religious propagandist, whatever his faith may be.  The school is a secular and civil institution, in which all have an equal interest, and none may lawfully make use of it as an instrument, or take advantage of its administration as an opportunity for the promotion of his peculiar religious views.

"As the state can have nothing to do with religion except to protect everyone in the enjoyment of his own, so the common schools have nothing to do with religion in any respect.  They are as completely secular as any of the other institutions of the state, in which all people alike have equal rights and privileges."  Orton, J., in *State v. Board*, supra.

Nothing in this opinion is to be construed as a departure from the decision of this court in *Moore v. Monroe*, 64 Iowa 369, where, while admitting the logical soundness of the opposing view, it was held that the constitutional provision against taxation for the support or maintenance of a house of worship was not violated by permitting the teacher of a public school to include in the daily exercises of such school the reading of the Scriptures and recitation of the Lord's Prayer; for whatever might be our view of the question as an original proposition, we have no desire to introduce confusion into our cases by overruling that precedent. Nor is there any occasion, at this time, to point out or discuss the limitations of the rule so laid down.  If, therefore, the plaintiff in the case at bar had done no more than to show that the reading of the Bible in any version or the use of the Lord's Prayer was practiced in this school, his complaint would, of course, be dismissed; but such, as we have seen, is not the state of the proof.  Neither do we, expressly or by implication, disparage parochial or private schools

for those whose consciences or preferences lead them to make use of such means for the education of their children. We can and do hold in high respect the convictions of those who believe it desirable that secular and religious instruction should go hand in hand, and that the school which combines mental and spiritual training is best adapted to the proper development of character in the young. The loyalty to their professed principles which leads such persons to found and maintain schools of this class at their private expense, while at the same time bearing their equal burden of taxation for the support of public schools, is worthy of admiration, and convincing proof of their sincerity. But it is doubtless true that this double burden (double only because voluntarily assumed) sometimes renders those who bear it susceptible to the misleading argument that, because they thus carry an extra load for conscience's sake, there is something wrong in the policy which forbids them to make the public school a means for accomplishing the end for which the parochial school is designed. If that feeling be allowed to prevail in a school district or a community where there is little or no sentiment to the contrary, ecclesiastic encroachment upon the legal nonreligious character of the public school is quite sure to become apparent. But, as we have before intimated, the right of a controversy of this kind is not to be decided by a count of the number of adherents on either side. The law and one are a majority, and must be allowed to prevail. The spirit which would make the state sponsor for any form of religion or worship, and the religion, whether Protestant or Catholic, which would make use of any of the powers or functions of the state to promote its own growth or influence, are un-American; they are not native to the soil; they are inconsistent with the equality of right and privilege and the freedom of conscience which are essential to the existence of a true democracy.

We have no criticism to offer of the great religious or-

ganization a local branch of which happens to figure, to some extent, in the transaction here in controversy, a transaction which we have condemned on legal grounds alone. We cheerfully and without reservation express our appreciation of its great services to mankind; of the great names which adorn its history and its literature; of its boundless charities and its steadfast adherence to its conception of the true faith. What we have said with reference to this case we would repeat with no less emphasis if the parochial school in question were under the patronage of the followers of Martin Luther or John Calvin or John Wesley or other Protestant leadership. The cry which is sometimes heard against the so-called "Godless school" is raised not by Catholics alone, and in not a few Protestant quarters there are manifestations at times of a disposition to wear away constitutional and legal restrictions by constant attrition, and bring about, in some greater or less degree, a union of church and state. But from whatever source they appear, such movements and influences should find the courts vigilantly on guard for the protection of every guaranty provided by Constitution or statute for keeping our common school system true to its original purpose.

III. Appellants further argue that, it

3. INJUNCTION: public officers, etc.: exercise of discretion: abuse: schools and school districts.

being within the discretion of the board of directors to abandon the schoolhouse and rent another room for the use of this school, its action in that respect cannot be controlled by injunction. It is to be admitted that no action within the board's discretion can be thus controlled; and, if this case involved no other question, the appeal would have to be sustained. But the discretion of the board is neither absolute nor unlimited. The statute provides that the board "may, when necessary, rent a room and employ a teacher, where there are ten children for whose accommodation there is no schoolhouse." (Code Section 2774.) That

this restricted discretion may be so abused as to call for judicial interference, we cannot doubt; and if without neces- sity calling for such action, if there be no children in the district for whose accommodation no schoolhouse is pro- vided, and if no better reason for abandoning the district's own schoolhouse is shown than to place the pupils under the sectarian influence of a parochial school, then this ac- tion is in excess of the granted power, and a clear abuse of the discretion given. A very recent case from North Dakota is here quite in point. There, as here, in a certain school district peopled largely by Catholics was a public school building; also a Catholic church, with a parochial school known as St. Joseph's Convent adjacent thereto. The board of directors of the public school submitted to a vote of the district a proposition to remove the school from the public school building to a room to be provided in St. Joseph's Convent, and it was carried by a decided majority. The director of the district refused to permit the removal, and mandamus was brought to compel it. In sustaining the director, the court says:

"We are satisfied indeed that both the order of the school board and the election are void, and that the lease of the new building and the removal of the school thereto were absolutely unwarranted by law."

Speaking of the provisions of the statute of that state, which does not materially differ from our own, the opinion proceeds as follows:

"It is a self-evident proposition that the public schools of the state are under legislative control, and that school directors have no powers except those which are conferred by the statutes upon them. A perusal of the sections [nam- ing them] will, we believe, make it apparent to all that the only instance in which a common school board may lease a building is in the case where there are nine children of school age who reside two and a half miles from the school-

house already erected, and when an additional school is needed for such persons.  *  *  *  It is apparent that in every other case it was the purpose of the legislature that the public schools in the so-called common school districts of the state should be exclusively conducted in buildings which are not only controlled by, but which are owned by, the public.  *  *  *  There is not, indeed, to be found anywhere in the statute any authorization for the leasing of a building for school purposes when (as the record shows in the case at bar) there is already in the common school district a school which is owned by the district, which is within two and a half miles of the students, and is adequate to the needs of the district." *Pronovost v. Brunette,* 36 N. D. 288 (162 N. W. 300).

The rule thus announced is not only good law, but it has also the best foundation in the nature and policy of our common school system.  Let any other become the settled law of the state, and the day of the destruction of our system of non-sectarian public education will be far advanced. Let it once be understood that it is possible by any scheme or device to lawfully compass any public school about with religious influences in the interest of any sect or denomination, and you will have offered a tempting prize to the propagandist and proselyter of every creed; and wherever the adherents of any particular creed can command a majority of any school board, it may abandon the schoolhouse provided for the common and equal use of all the people, move the school into some church or some parochial or private building established for sectarian use, put in charge of it trained ecclesiastics, bound by solemn vows to devote their lives, their services, and all their God-given powers to the advancement of the interests of their church, fill the schoolroom with distinctive emblems of their faith, and by a multitude of influences, silent as well as expressed, shape the plastic minds and characters of the young children com-

mitted to their care in accordance with their own religious views, and saddle the expense of this sectarian education upon the taxpayers. We do not believe that the people of this country are ready for such a surrender of one of the most distinctive features of a free government to ecclesiastical domination, and we are sure that, when properly construed, the law will not fail to place upon it the seal of condemnation.

IV. Finally, objection is made to the

**4. SCHOOLS AND SCHOOL DISTRICTS: government, officers, etc.: illegal action: relief: injunction.** procedure which has been pursued in this case. The point made is that, in any event, plaintiff's objection should have been made to the board of directors, and if there overruled, his remedy was by appeal to the county superintendent, and, if necessary, thence to the state superintendent. The objection cannot be sustained. The rule is thoroughly well settled that, while the discretion granted by statute to the board of directors can be reviewed only by appeal to the county superintendent, yet, where it "acts without jurisdiction, or has exceeded its powers and by some act in an official capacity has done or attempted to do that which it has not a right to do, the courts have jurisdiction to set aside the unauthorized act." See *Templer v. School Twp.*, 160 Iowa 398, 402; *Kinzer v. Independent School Dist.*, 129 Iowa 443; *School Township of Newton v. Independent School Dist.*, 110 Iowa 30; *Rodgers v. Independent School Dist. of Colfax*, 100 Iowa 317; *Perkins v. Board of Directors*, 56 Iowa 476; *Benjamin v. District*, 50 Iowa 648. We have found and are satisfied that the board of directors, in the matters complained of, acted in excess of its lawful authority, and, therefore, appeal to the superintendent was not required.

We reach the conclusion that the trial court's finding in favor of the plaintiff should be sustained. We are of the opinion, however, that the decree below should, to a certain extent, be modified. As the parochial building is private property, and its owners and patrons have the right to maintain therein a religious school, if they are so disposed, the court has neither authority nor desire to deny or interfere with the exercise of such right. It has the authority, however, and it is its duty, to enjoin the defendants and their successors in office from directly or indirectly making any appropriation or use of the public funds for the support or in aid of such parochial school, or of any so-called public school maintained or conducted in connection with such parochial school. They should also be enjoined from permitting or allowing religious or sectarian instruction of any kind to be provided or given in the public school wherever the same may be established, such exclusion not to be construed as prohibiting the reading of the Scriptures, without note or comment, or the recitation of the Lord's Prayer. As obedience to such injunction will make necessary the providing of accommodations for the public school in said subdistrict elsewhere than in connection with the church or church school, we think it must be assumed that the board of directors will do its duty in supplying the need so occasioned, and that the mandatory features of the decree as rendered below may properly be eliminated.

*5. INJUNCTION: decree: unlawful appropriation of school funds: modification.*

*6. SCHOOLS AND SCHOOL DISTRICTS: government, etc.: permissible use of Bible, etc.*

As thus modified, the decree of the district court must be affirmed at the cost of the appellant.—*Affirmed.*

LADD, EVANS, GAYNOR, and STEVENS, JJ., concur.

SALINGER, J. (dissenting). The majority holds injunction will lie to restrain the paying over of public funds to school officers if such money is used in support of a school

wherein practices are permitted which amount to a propaganda for some religious sect. If it be assumed such practices exist, either with the direct or implied consent of the school officers, that constitutes a wrong for which there is some remedy. But we should not trample upon wisely established usages of the law merely because we are convinced wrong has been done. I contend for no more than that hard cases shall not make bad law. In the last analysis, the injunction against the use of public money is here awarded because a school board and school officers and teachers employed by them are, in specified regards, committing acts which the law condemns. It would be affectation to cite authorities for the proposition that, no matter how clear it may be that a wrong exists to be remedied, the extraordinary remedy of injunction is not due unless it further be made to appear that injunction is the only adequate remedy. To be sure, starving a school out of existence is a most adequate method of stopping improper conduct of such school. So, burning down a house terminates the wrongful occupation of it. But, ordinarily, eviction of the trespasser is resorted to, instead. Is starving this school out of existence by injunction the only adequate method of abating the practices complained of?

It may not be denied that the laws of this state give to the department of public instruction, either by direct action or on the appellate side, or both, full power to discipline a teacher who misconducts himself, and to remedy a wrong either by omission or commission committed by boards of directors and school officers. And if it were true that this is an unwise delegation of power, the fact would not enlarge the powers of the courts.

It seems to be the thought of the majority that resort to the department of public instruction is not an adequate remedy: First, because the discretion of the board to abandon a schoolhouse and rent another room for the use

of a school is not in the absolute discretion of the board, and
that whether such abandonment and renting is authorized
depends upon whether it is necessary to abandon one room
and rent the other; second, that, since the department of
public instruction cannot enter a judgment for a money re-
covery, nor enforce its own mandates, that, therefore, injunc-
tion lies in this case. Grant that, where the board abandons
one room and rents another, there may be an inquiry into
whether the change was necessary. That proves that review
may be had, but not that it may not be done by the depart-
ment, and may or must be done on injunction. And if it be
sound argument that injunction is the remedy, because the
department cannot enter a money recovery, and one must re-
sort to the court if the lawful orders of the department are
disobeyed, such argument proves too much. If that be the
test of power, the department of public instruction has no
power to act. If it should cancel the certificate of a teacher
for misconduct, that order, in and of itself, will not stop the
employment of the teacher by school officers, nor paying the
teacher out of public funds. Notwithstanding the cancella-
tion of the certificate, the courts must be resorted to, to
prevent such teacher from acting or being so paid. Follow-
ing the majority to the logical end, the department has no
power to cancel a certificate; and, where a teacher so con-
ducts himself as that his certificate should be revoked, the
revocation should be accomplished by enjoining him from
teaching, and the board from paying him. That a quasi
judicial department or a ministerial one even cannot take
all the steps that a court may, does not establish that its
powers are so inadequate as that equity may interfere by in-
junctive order. The orders of the Interstate Commerce Com-
mission must be enforced by the courts. Will that authorize
courts to fix rates by enjoining rates charged and making a
mandatory order that different ones be charged? The find-
ing of our industrial commissioner must be effectuated by

decree of court. Can the court, therefore, make an original award under the Compensation Act? A trespass by use of a vacated highway may be punished by the courts only, but the vacation cannot be restrained because the subject-matter is, by statute, given to the town council. *McLachlan v. Incorporated Town of Gray*, 105 Iowa 259. While I agree that the cases cited by the majority hold that, when school officers act beyond their jurisdiction, appeal to the county superintendent is, if a remedy at all, not the exclusive remedy, I fail to see the applicability of it. Surely, the school board had power to determine in the first instance whether it was wise to house a school sparsely attended in a better room, and at a nominal rental. Theirs may have been an unwise decision. You may assume, for the sake of argument, that it was a corrupt one,—but that does not go to power. Wherefore, the county superintendent manifestly had power to review such action. See *Bogaard v. Independent Dist. of Plainview*, 93 Iowa 269, at 272; *Rodgers v. Independent School Dist. of Colfax*, 100 Iowa 317. Surely, the board had power to prevent a teacher from engaging in a religious propaganda while teaching on public pay. Surely, the county superintendent had power, either originally or on appeal, to compel the cessation of the practice. Certainly, he had power to disqualify such teacher from teaching at all. If he failed in his duty, surely the state superintendent could act effectively.

The majority is driven into inconsistency. It meets claims that the directors did not know what was being done as if their knowing or not knowing was important. It declares that, if "these officers gave any attention whatever to their official trust, they must have known the facts as they existed," and that "the only explanation is that, having surrendered the school to the care of the church, the officers cast off all thought of future care or attention, except to go through the form, from time to time, of contracting with the

teachers, and providing for the support of the school from the public funds;" and that "there is no showing that the board ordered a discontinuance of the use of the catechism," and that, even after complaint made, neither the board, any director, or any officer, "took any action whatever to interfere with the practice, or gave any order or instruction to the sister in charge of the school to discontinue it;" that there is no showing of "any real or substantial removal of the objectionable features;" that, when complaint was made, no more was done than to "tell the complaining parties to investigate, and report again in the future;" that "not one of the directors ever visited the school, or gave to the sister in charge any instruction, direction, or rule with reference to her duties;" that, as to directions given, "there is not a word of this kind in the records of the board or of the school which have been put in evidence;" that it suffices to show the objectionable practices were sanctioned, though, as was the case in *Hysong v. Gallitzin Borough School District*, 164 Pa. 629, there was no proof of formal and recorded resolution authorizing or sanctioning the practice; that the county superintendent does not say that, when he heard of the teaching of the catechism in this room, that he "took measures to prevent it, and that such study was thereafter abandoned," and that, "if it ever occurred to his supervisory discretion to inquire into the absence of the younger pupils who, as a rule, constitute the larger part of every public school, he does not mention it."   To cap all, the order below is modified to the extent of leaving it to the board to take the pupils from the room where they now are, and provide them with accommodations elsewhere in the subdistrict, which is done with a statement that "it must be assumed that the board of directors will do its duty in supplying the need so occasioned, and that the mandatory features of the decree as rendered below may properly be eliminated."

The inconsistency is most marked. After disposing of the appeal by holding that the court has jurisdiction to enjoin because no officer in the department of public instruction has efficient power to act, granting the injunction is sustained because these officers did not act. If the department had no power to act, and, therefore, the courts may act, it becomes entirely immaterial that the department did not act. It can base no argument to point out that there was a failure to do what there was no power to do. · And, after holding that injunction must be sustained because the board and others had no power to remedy, the final word leaves the remedy to the board. If the board can now take the children from where they are and put them into another school room, it always had that power; and the county superintendent and the state superintendent had power to see that they did this. It must follow that the remedy by injunction is not sustainable upon the ground that the department could not give an adequate remedy.

II. It is true both the statute and the Constitution prohibit the appropriation of public money in aid of any private or sectarian school; but, while that establishes that this must not be done, it does not in the least enlarge the powers of the court of chancery on injunctions. The law prohibits murder. Does that justify an order restraining one from committing it? A school should not be transplanted without good reason, and renting a place for it to be conducted in was held to be wrongful in *Pronovost v. Brunette,* 36 N. D. 288 (162 N. W. 300). But how does that authorize injunctive relief, rather than a resort to the department of public instruction? The majority says this act was wrongful. But that does not prove that injunction is the remedy. My views seem to me to be supported by what the authorities negative and affirm—and as much by those relied on by the majority as by others. One striking instance is found in *Board of Ed. of City of Cincinnati v. Minor,* 23

Ohio St. 211. The case is squarely against the majority
holding, and the opinion is driven to disregard what is the
*decision*, and to support itself by its general language,
"broader discussion," to the effect that true Christianity
asks no aid from government. The *decision* is repudiated
because it is "technical," and the only use made of the case
is to set out said "broad" language. What the Ohio case
*decides* is that an injunction should not issue restraining
a board of education, and certain of its members and officers,
from carrying into effect or enforcing certain resolutions
adopted by the board which prohibit religious instruction
and a reading of religious books, including the Holy Bible,
in the common schools; and the refusal is put upon the
ground that, the legislature having placed the management
of public schools under the exclusive control of directors,
trustees, and boards of education, the courts have no right-
ful authority to interfere, by directing what instructions
shall be given or what books shall be read therein. The
citation of *Donahoe v. Richards*, 38 Me. 379, is also of
doubtful use. In the first place, it was a damage suit, and
no injunction was sought. In the next, it is authority
against several positions taken by the majority. It was an
action by next friend against the superintending school
committee, to recover damages for maliciously, wrongfully,
and unjustifiably expelling a pupil from one of the town
schools. She was expelled for refusing to read in the school
the Protestant version of the English Bible, which had
previously been ordered to be used therein by the defendants.
The exact holding is that the legislature has reposed the
power of directing the general course of instructions and
what books shall be used in the schools to this committee,
and it may rightfully enforce obedience to all the regulations
by it made within the sphere of its authority; that, for a
refusal to read from the books thus prescribed, the commit-
tee may expel the disobedient scholar; that no scholar can

escape or evade such requirement, when made by the committee, under the plea that his conscience will not allow the reading of such a book, nor can the ordinance be nullified because the church of which the scholar is a member holds, and has so instructed its members, that it is a sin to read the books prescribed; that a law is not unconstitutional because it may prohibit what one may conscientiously think right, or require what he may conscientiously think wrong; and that a requirement by this committee that the Protestant version of the Bible shall be read in the public schools by the scholars who are able to read, is no unconstitutional provision, and is binding on all the members of the school, although composed of divers religious sects. Whether we care to go as far as this or not, it certainly affords no support for the majority.

In *O'Connor v. Hendrick*, 184 N. Y. 421 (77 N. E. 612), the state superintendent of public instruction had, under delegated authority from the legislature, made a rule prohibiting teachers from wearing a distinct religious garb while engaged in the work of teaching; and, the question being whether this rule was reasonable, it was held that he could exercise any powers the legislature might, and that it might require all teachers to wear a particular garb as an emblem of their profession, and no one could complain. Wherefore, this regulation was a reasonable one. Now, while it is perhaps true that the power of regulation which the New York legislature gave to the superintendent of public instruction is not conferred upon the county superintendent in Iowa as an original power, such power is given the school boards, and it must follow that, this being so, what the school board does or fails to do in this regard can be regulated on appeal to the county superintendent, because giving such power to the board of necessity gives the superintendent jurisdiction to regulate that power on appeal.

In *Commonwealth v. Herr*, 229 Pa. 132 (78 Atl. 68), a statute which prescribed the wearing in the public school by a teacher of any dress, etc., indicating the fact that such teacher is an adherent or member of any religious order, etc., and imposing a fine upon the board of directors permitting the same, is held not to be violative of constitutional right to freedom of conscience and religious belief, because it is directed against actions, and not beliefs, and only against the acts of the teachers while engaged in the performance of their duties as such,—something which the legislature has the right to control. The case was a prosecution of the school directors for failure to enforce this statute. Several cases cited for the opinion do sustain the granting of injunctions. But it does not appear that statutes gave power in the premises to a department of public instruction, and in each of them, the *practices* complained of, and not the support of the school, was enjoined. See *Stevenson v. Hanyon*, 4 Pa. St. 395; *Herold v. Parish Board*, 136 La. 1034 (68 So. 116); *Hysong v. School Dist. of Gallitzin*, 164 Pa. 629 (30 Atl. 482.) All I can find in *Moore v. Monroe*, 64 Iowa 367, is that the statute, as it stood at the time of the decision, makes it a matter of individual option with school teachers as to whether they will use the Bible in their schoolroom; that such option is restricted only by the provisions that no pupil shall be required to read it contrary to the wishes of his parent or guardian; and that such option is not in conflict with the Constitution. The prayer was for injunction to prevent the reading or repeating of passages in the Bible. It certainly is held that this injunction will not lie, although it is not put upon the express ground that there is adequate remedy at law. It is said *arguendo* that there is, at all events, no ground for enjoining religious exercises in the public schools, where it does not appear that attendance thereupon is compulsory and that the burden of taxation is thereby increased.

In *Jenkins v. Inhabitants of Andover,* 103 Mass. 94, it is held that a town may not, independently of statute law, raise, and, by reason of constitutional provisions, may not take authority by statute to raise, by taxation, and appropriate money to support as a public school, a school founded by a charitable bequest which vests the order and superintendence in trustees who, though a majority of them are to be chosen by the inhabitants of the town, yet are limited to be members of certain religious societies; wherefore, there may be an injunction restraining the enforcement of a vote by which it is attempted to raise money by taxation to appropriate the same to the support of such school. It should not require elaborate argument to distinguish restraining the raising of a tax for the support of what is confessedly not a public school, either in form or substance, and an injunction to restrain the use of money already raised, and settling on injunction whether certain practices make a parochial out of what was a public school. The other citations involve a suit to collect public money for school aid (*Synod of Dakota v. State,* 2 S. D. 366 [50 N. W. 632]); mandamus ordering the payment of such money (*Otken v. Lamkin,* 56 Miss. 758; *State v. Hallock,* 16 Nev. 373, at 376); mandamus to remove a school to a place leased as ordered by resolution of the board (*Pronovost v. Brunette* 36 N. D. 288 [162 N. W. 300]); and mandamus to compel desistence from objectionable practices (*People v. Board of Education,* 245 Ill. 334 [92 N. E. 251]; *State v. District Board of City of Edgerton,* 76 Wis. 177 [44 N. W. 967]; *State v. Scheve,* 65 Neb. 853 [91 N. W. 846, and 93 N. W. 169]). In this last, the fact that the court entertained an application for mandamus by the state running to the school board to compel it to have these practices discontinued, demonstrates that the school board might efficiently provide a remedy, and, therefore, demonstrates that failure to do

so makes a case, not for the court, but for the department of public instruction.

III.   It has been demonstrated that the school whose means of life the majority proposed to cut off at the root is still, in form at least, a public school: that is to say, no action has dissolved it and declared it to be a parochial school. Its officers are still acting on authority of statute.   The opinion itself says that misusing the alleged appropriation of funds is an act which is being done by "the defendants in their official capacity."   I have pointed out that abating the evil by transplanting the school to proper quarters is, by the majority, left to the district board.

Assume the practices might be enjoined, and that is still different from enjoining the use of school money.   To the reasons I have already given why the latter should not be done, it may be added that, if the *practices* be restrained, desistence will automatically end the misuse of money.   But where the payment of support money is restrained because of the practices, their abandonment would still leave the injunction in force.   Enjoining the practices might lead to some contempt prosecutions while the school was going on. The remedy sustained here stops the school until, on another hearing, it is proved that the practices have been discontinued; and as the school was not going, it could not well be shown that it was being properly conducted. The difficulty may be avoided by obeying the legislative will, and proceeding before the department of public instruction.

In one word, where the use of public money is unlawful only because certain things are being done by school officers, it is true that stopping the money will stop the doing of these things.   Is it not as true that, if the acts are stopped, the use of the money will not be unlawful?   I have stated as well as I am able why I think it better to force legalization of the use of the money by stopping the acts that make the use unlawful, than to prevent the unlawful

use of money by the destruction of the object upon which it will be expended.

I think we should reverse on the ground that injunction to stop the use of public money was not the proper procedure, because there is an adequate remedy by appeal to the department of public instruction.

Preston, C. J.—My views in regard to the right of appeal to the school authorities are indicated in the recent case of *Hume v. School District,* 180 Iowa 1233. I concur in the dissent of Justice Salinger, in so far as it holds that there is an adequate remedy through the school authorities, and that the injunctive remedy will not lie, at least until the other has been exhausted.