SOMMERVILLE, X
The judges of the Court of Appeal, Second Circuit, certify certain questions to the court in this case, ■with a request for instructions. The entire record was ordered up for consideration by the court; and the case will now be disposed of.
The three plaintiffs are resident taxpayers of Caddo parish. Two of them are parents of children who are in attendance at the public schools of that parish; and the third is the parent of children whom he expects and intends to send to said schools for their education.
Sidney L. Herold and Henry Heilperin, two of the plaintiffs, are Jews; and the third plaintiff, James B. Marston, is a Catholic. They complain of the action of the parish board of school directors in adopting the following resolution:
“Whereas, it is a fact well established among us that the children in our public schools are at the most impressionable age for receiving and retaining good or evil; and
“Whereas, the lessons and truths contained within the Holy Bible are acknowledged by right-thinking people as being of paramount value in creating and maintaining a better moral atmosphere in every community, and also in the individual life: Therefore, be it
“Resolved that the principals and teachers be .requested to open daily sessions of the public schools of Caddo parish with readings from the Bible, without note or comment, and, when the leader, is willing to do so, the Lord’s Prayer shall be offered.”
[1, 2] They allege that the Bible referred to in the foregoing resolution is the King James version, including the New, as well as the Old, Testament; that the reading of the Bible and the offering of the Lord’s Prayer are exercises which are prohibited by the Constitution of the state, in articles 4 and 53, which provide that:
“Every person has the natural right to worship God, -according to the dictates of his conscience, and no law shall be passed respecting an establishment of religion.”
And that:
« * * * No preference shall ever be given to, nor any discrimination made against, any church, sect or creed of religion, or any form of religious faith or worship. * * * ”
They further allege that the resolution of the board “compels the children of your petitioners Marston and Heilperin to join in forms of worship which are contrary to the dictates of their own consciences, and that it interferes with their natural right to worship God according to their own religious conviction”; “that such services constitute a sectarian form of worship, namely, the form of worship adhered to by the Protestant sects of the Christian religion; and such action constitutes a preference in its favor, and a discrimination against the Catholic and Jewish forms of worship;” and that it is an establishment of religion; that petitioners disbelieve, upon religious conviction, in such services; further, that such action is prohibited by Statute No. 214 of 1912, p. 464, for the reason that there is vested in the state board of education alone power or authority to make rules, by-laws, and regulations for the government of the public schools of the state, and to give directions as to the branches of study which shall be taught. And they pray that an injunction issue to prevent defendants from enforcing and carrying into effect the resolution referred to; and they further ask that the defendants be enjoined “from having religious exercises of any character whatsoever in said schools.”
The prayer of the petition, and the preliminary injunction issued in accordance there *1037 with, are too broad in their terms. The schoolhouses of the parish belong to the people of that parish, and they are under the control of the school authorities of the parish. If, at the time when the schoolhouses are not being occupied or used for school purposes, the school board were to permit the schoolhouses to be used for religious or other purposes, the rights of plaintiffs would not be infringed in any way, and they might not be heard to complain of such action by the school authorities.
In an amended petition plaintiffs allege that the word ‘'Bible,” in said resolution, refers to a Protestant version thereof, including the Old and New Testament, and that the reading thereof will be the actual practice under said resolution.
The parish school board and the parish superintendent answered, admitted the passage of the resolution referred to, and alleged that it was their intention to put the same into effect; but they denied:
“That the effect of said resolution will be to force conducting religion daily in the public schools, or that it will result, or was intended to result, in reading solely from the Protestant Bible; on the contrary, they aver that it was not intended as a religious worship, nor did they intend thereby to force or require any one to read any Bible or to conduct any form of religious worship.”
And they further aver:
“That any Bible, Catholic or Protestant, Jewish or otherwise, may have been read by the teachers under said resolution.”
They deny that the Bible is a sectarian book, and they allege:
“That they had no intention of permitting any teacher to resort to any sectarian practice in said schools; and, were one to do so, or attempt to do so, under the guise of said resolution, that they would immediately order the same discontinued.”
There was judgment setting aside the preliminary injunction, and plaintiffs appealed to the Court of Appeal, from which court the case has been ordered up to this court.
“Courts take judicial notice of the contents of the Bible, of the numerous sects into which the religious world is divided, and also of the general doctrines maintained by each sect.” Jones on Evidence, vol. 1, § 131, p. 274; Abbott, Proof on Eacts, p. 634; State v. Board, 76 Wis. 177, 44 N. W. 967, 7 L. R. A. 830, 20 Am. St. Rep. 41; Smith v. Pedigo, 145 Ind. 361, 33 N. E. 777, 44 N. E. 363, 19 L. R. A. 433, 32 L. R. A. 838; Hilton v. Roylance, 25 Utah, 129, 69 Pac. 660, 58 L. R. A. 723, 95 Am. St. Rep. 821.
It is generally accepted that the Old Testament was originally written in Hebrew, and that the New Testament was originally written in Greek. The first complete English translation is said to have appeared about the year 1383. The Geneva Bible, embracing the New and Old Testaments, was translated into English at Geneva in 1560, and in London in 1576; it was the first to omit the Apocrypha. There is the King James version, or translation, of the year 1604; the Douay version or translation of the New Testament at Rheims in 1582; and the Old Testament at Douai in 1609. There is Luther’s Bible, 1521; and then there is the Rabbinical Bible. There is also the Koran, often called the Mohammedan Bible.
There'are doubtless differences in the several translations of the Bible just referred to. But it is not within the province of the court in this case to point out these differences, or to give them consideration. The court recognizes the difference between the Rabbinical Bible and the Christian Bible, in that the latter adds to the former the New Testament Scriptures, which are the bases of the Christian.religion. There may be other differences, such as the inclusion in the one, and the exclusion from the other, of the Apocrypha. But this difference is immaterial in the matter before the court. Christians make daily use of the Old Testament Scriptures, and the differences between the Rabbinical and Christian editions are not known to the ordinary lay reader beyond the fact that *1039 tlie Christian Bible contains the New Testament.
The same condition of mind exists with reference to the Douay and the King James translations. There are said to be some differences and some errors in translation, but they are not known to the ordinary lay reader ; and the court is not called upon to point out these differences. They are both Christian Bibles, or the Bibles of the Christians.
And, when Mr. I-Ieilperin alleges that the resolution complained of compels his children “to join in forms of worship which are contrary to the dictates of their own consciences, and that it interferes with their natural right to worship according to their own religious convictions,” we recognize that his complaint is made against the use of the New Testament Scriptures in the' public school where his children attend; and, while he admits that God made us, and that we are taught to serve him in both the Old and the New Testaments, he shows that the latter teaches that the Messiah has come; the divinity of Christ; that God is three in one— the Trinity; and that the Old Testament Scriptures teach that the Messiah is yet to come; he denies the divinity of Christ.
While Jews and Christians believe that the Bible is the inspired Word of God, they differ as to what that Word is; and the Jew accepts only the Old Testament, while the Christian accepts both the Old and the New.
But the complaint of Mr. Marston that the reading of the Bible would be contrary to the dictates of his conscience is not clear. He fails to point out in his petition wherein his conscience would be violated. On the brief of plaintiffs it is declared:
“We are making no fight against the Bible. But what we do contend is that its teaching finds its proper place in the home, in the church, and in the Sunday school, and that it cannot be injected into the public schools without constituting and creating religious persecution.”
Again:
“It is said that the Catholic version might be used, but without note or comment. Such use is an equal violation of the rights of the Catholic, as well as of the Protestant.”
And:
“Likewise to the Catholic child, in whom has been inculcated the doctrine which prohibits the reading of the Bible without authoritative comment from the head of his own church, such daily exercises not only subject him to a form of worship of which his parents do not approve, but that such form of worship is proper.”
It is not alleged in the petition, and there is no evidence whatever in the record, in support of that' portion of the brief to the effect that there is a doctrine in the Catholic • Church which prohibits the reading of the Bible without comment from the head of that branch of the Christian church. It is found only on the brief of plaintiffs. •
It was agreed between plaintiffs and defendants:
“That all questions that may arise as to the history of the Bible and of the different versions thereof, and other matters pertaining thereto, as well as all matters relating to the beliefs, creeds, and modes of worship of different religions, including the different forms of the Christian religion, are proper matters for judicial notice.” ‘
We notice that the Catholic Church stands for a complete Word, made up partly of the sacred Scriptures and partly of oral tradition. But we do not find the “doctrine” set forth on the brief to be a dogma of that church. The Catholic child may or may not be prohibited from reading the Bible without authoritative comment, but such prohibition would not be a doctrine of that church or creed. And, in view of the very recent utterances of His Eminence Cardinal Gibbons, one would not think that such prohibition can exist. That eminent man of God and high churchman, in a recent sermon, pointed to his own college days, when he says he carried a New Testament at all times, and read one chapter every day. He urged the importance of this plan for all devout Christians. In the course of his sermon he is reported to have said:
“The timely recollection of a fitting text of the Scriptures is the best antidote against temp *1041 tation.” “But we cannot have such texts occur to us unless we are filled with the Word-of God and accustomed to frequently and regularly read the Book.”
The Cardinal gave a striking exhibition of his own memory for texts by quoting many to fit into all situations. He would mention some sin, and then, after quoting the more familiar text that referred to it, would bring up other texts not so well known, but equally fitting and equally forcible in wording. He further said:
“There was a great philosopher who would say that he never left men without feeling less a man. Now, it is true of the faithful lover of the Word that he never leaves the Bible without feeling more of a man.”
We further read of the work of the “Society of St. Jerome,” which was formed for the purpose of translating and disseminating the New Testament in the vernacular of Italy. The work was under the patronage of influential clericals, some of whom were said to be members of the College of Cardinals. The president of the society is said to have been Mgr. Della Chiesa, now Pope Benedict XV. The translation is said to be a beautiful one, and that a million copies were sold in a short time. Recently Pope Benedict XV, in a letter answering an address on behalf of the Society of St. Jerome, is quoted as saying in part, with reference to their work:
“They are doing a work of supreme advantage for the forming for Christian perfection of the minds of those who, like you [addressing Cardinal Cassetta], are waiting eagerly for the diffusion of the Divine Gospels, and we have therefore reason to rejoice in the enterprise, so excellent in itself and so grateful to us.”
Continuing, His Holiness said:
“We ardently desire, and make it a matter of earnest exhortation, that you gather the fruit of a very wide diffusion of the Books of the Gospels, and that you may also be able to obtain another advantage, which would form one of our ideals, that is to say, that the sacred books enter into the bosom of Christian families, and be there like the piece of silver mentioned in the parable, which all shall seek for attentively and guard jealously, so that the faithful may accustom themselves to read the Holy Gospels and comment on them every day, learning thus to live holily confirmed in everything to the Divine will.”
We will assume that the Bible referred to by these eminent churchmen was the Douay version, or translation. But we cannot conclude that it is a doctrine of the Catholic Church to prohibit the reading of the Bible without authoritative comment of the head of that church, further than as contained in the Douay version itself.
The Douay Bible published in New York has the approbation of 1-Iis Eminence James Cardinal Gibbons printed at the beginning of the Book in these words:
“We hereby approve of the publication by John Murphy Company of the Catholic Bible, which is an accurate reprint of the Iiheims and Douay edition with Dr. Challoner’s Notes.
“The sacred volume is printed in an attractive style.”
And His Eminence John Cardinal Earley expresses his approbation and recommendation in the following words:
“I heartily indorse your publication of the Holy Bible. It is well edited and should commend itself to all Catholics.”
And, as the court will not concern itself with the differences, or alleged errors, in the different translations of the Christian Bible, or the Bibles of the Christians, we cannot conclude that plaintiff Marston or his children would have their consciences violated by the reading of the Bible, or of the offering of the Lord’s Prayer, which prayer is contained in all versions or translations of the New Testament.
Turning again to the consideration of the case of Messrs. Herold and I-Ieilperin, we note that the United States government provides in part for the education of the citizens of the country. Education is one of the functions of government; and the public school system is a department of the government: Education insures domestic tranquility, provides for the common defense, pro *1043 motes the general welfare, and it secures the blessings of liberty to ourselves and our posterity. The state of Louisiana from the earliest time has made provision for the support of education, beginning with the Corn stitution of 1845, arts. 135 and 136.
Education in this country- embraces the training of both mind and heart. Through it character is formed and developed. It includes the primary and the higher branches; there are literary and scientific courses; also the mechanical and vocational schools; industry and morality form parts of the system; love of fellow man, love of country, and love of God are taught in the public schools of the land.
There have been differences in expressions of opinion as to whether this is a Christian land or not, in a strictly limited sense; but there is not, and there has not been, a question as to its being a godly land, or that we are a religious people.
In the Declaration of Independence He was acknowledged as the God over all and the giver of all good gifts, in the following language:
“When in the course of human events, it becomes necessary for one people to dissolve the political bands which have connected them with another, and to assume among the powers of the earth, the separate and equal station to which the laws of nature and of nature’s God entitle them, a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation.
“We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with unalienable rights, that among these are life, liberty and the pursuit of happiness,” etc.
And in the closing paragraph He is appealed to as follows:
“We, therefore, the representatives of the United States of America, in general congress assembled, appealing to the Supreme Judge of the world for the rectitude of our intentions, do,” etc. “And for the support of this declaration, with a firm reliance on the protection of Divine Providence, we mutually pledge to each other our lives, our fortunes and our sacred honor.”
In the Articles of Confederation, No. 13, God was recognized in the following language:
“And whereas it has pleased the Great Governor of the world to incline the hearts of the legislatures we respectfully represent in congress,” etc.
And, while there is no express mention made of His Son, Jesus Christ, He is referred to in the date of that instrument as follows:
“Done at Philadelphia, in the state of Pennsylvania, this 9th day of July, in the year of our Lord one thousand seven hundred and seventy-eight, and the third year of the independence of America.”
A similar reference is made to “our” Lord in the Constitution of the United States. But, while making this indirect recognition, the first amendment to the Constitution provides that:
“Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof,” etc.
And Congress, in stating the qualifications to hold office for the purpose of discharging the governmental duties and functions devolving upon those holding office under the national government, provided that they should ask the help of God to discharge those duties, in an oath of office closing with:
“So help me God.” Rev. St. §§ 1756,1757 (U. S. Comp. St. 1913, § 3218).
The Constitution of Delaware, in prescribing the formal oath, uses the following:
“I, A. B., do profess faith in God the Father, and in Jesus Christ, His only Son, and in the Holy Ghost, one God, blessed forevermore; and I do acknowledge the Holy Scriptures in the Old and New Testament to be given by divine inspiration.” Const. 1776, art. 22.
In discussing the above, together with other evidences, the Supreme Court, in the case of Holy Trinity Church v. United States, 143 U. S. 457, 471, 12 Sup. Ct. 511, 516 (36 L. Ed. 226), proceeded to say:
“If we pass beyond these matters to a view of American life as expressed by its laws, its busi *1045 mess, its customs, and its society, we find everywhere a clear recognition of the same truth. Among other matters, note the following: The form of oath universally prevailing, con--eluding' with an appeal to the Almighty; the •custom of opening sessions of all deliberative bodies and most conventions with prayer; the prefatory words of all wills, ‘In the name of God, amen;’ the laws respecting the observance of the Sabbath, with the general cessation of ■all secular business, and the closing of courts, Legislatures, and other similar public assemblies on that day; the churches and church organizations which abound in every city, town, and hamlet; the multitude of charitable organizations existing everywhere under Christian auspices ; the gigantic missionary associations, with .general support, and aiming to establish Christian missions in every quarter of the globe. These, and many other matters which might be noticed, add a volume of unofficial declarations to the mass of organic utterances that this is a Christian nation.”
Mr. Story, in treating of the first amendment to the Constitution, says, in part:
“Section 1874. Probably at the time of the adoption of the Constitution, and of the amendment to it now under consideration, the general •and universal sentiment in America was that Christianity ought to receive encouragement from the state so far as it was not incompatible with the private rights of conscience and the freedom of religious worship. An attempt to level all religion and to make it a matter of state polity to hold all in utter indifference, would have created universal disapprobation, if not universal indignation.”
“Section 1876. But the duty of supporting religion, and especially the Christian religion, is very different from the right to force the consciences of other men or to punish them for worshipping God in the manner in which they believe their accountability to Him requires. It has been truly said that: ‘Religion, or the duty we owe to our Creator and the manner of discharging it, can be dictated only by reason and conviction, not by force or violence.’ * * * The rights of conscience are, indeed, beyond the just reach of any human power. They are given by God, and cannot be encroached upon by human authority without a criminal disobedience of the precepts of natural as well as of revealed religion. •
“Section 1877. The real object of the amendment was not to countenance, much less to advance, Mohammedanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment which should give to a hierarchy the exclusive patronage of the national government.”
Story on the Constitution.
The Code of Practice of this state requires that:
■ “The witnesses * * * must be sworn on the Bible, in open court.” Article 478.
The Constitution of this state, in the preamble, places God before the state, in the following language:
“We, the people of the state of Louisiana, grateful to Almighty God for the civil, political and religious liberties we enjoy and desiring to secure the continuance of these blessings, do ordain and establish this Constitution.”
And, with real Christian gratitude for the blessing of religious liberties to us, the worship of God is recognized, and in article 4 of that instrument it is ordained:
“Every person has the natural right to worship God, according to the dictates of his conscience, and no law shall be passed respecting an establishment of religion.”
And, again, in article 53:
“No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such, and no preference shall ever be given to, or any discrimination made against, any church, sect or creed of religion, or any form of religious faith or worship,” etc.
Therefore, while we are grateful to God for religious freedom, with .other blessings, we may not interfere with any citizen’s natural right to also worship that same God according to the dictates of his own conscience. The Jew will be permitted without interference to worship God according to his conscience, and so will all others.
Does the resolution under consideration interfere with the natural rights of these plaintiffs to worship God, or to have their children worship God, according to the dictates of their consciences, or does it give a preference to Christians, and discriminate against Jews?
While the resolution simply requests principals and teachers of the public schools of Caddo parish to open the daily sessions with reading from the Bible, without note or comment, the preamble to the resolution shows that this reading is for the purpose of teach *1047 ing children “at the most impressionable age” “lessons and truths contained within the Holy Bible” as being “of paramount vaL ue in creating and maintaining a better moral atmosphere” in the community at large, and also in the individual life.
The “lessons and truths” may be taught from the New Testament, as well as the Old Testament. The Christian parents might not be heard to object to “the lessons and truths contained within the Holy Bible” being taught to iheir children for the purpose of inculcating morals, because they profess to believe in the inspiration of the whole Word. But with the Jew it is different. He denies that the New Testament is the word of God, and he denies our Savior. He does not deny most of the moral teachings of Jesus Christ, but he denies His divinity and His resurrection.
And, as he is guaranteed “the natural right to worship God, according to the dictates of his conscience,” and as the resolution in question permits “lessons and truths” to be read or taught from the New Testament, particularly concerning the Son of God and His resurrection from the dead, etc., it gives a preference to the children of the Christian parents, and discriminates against the children of the Jews. The resolution is therefore violative of the Constitution.
The request made by the board of school directors of Caddo parish that the principals and teachers in its employ and under its control “open daily séssions of the public schools of Caddo parish with reading from the Bible” is the equivalent of a command to them to do so. To request that the daily session should be opened with Bible reading and the offering of the Lord’s Prayer is to say that the exercises for the day shall begin with such reading and'prayer. And the request of the employer that the employes should do so as a part of the regular exercises in the schools is an order to that effect.
The “lessons and truths” contained in the Holy Bible to be taught through reading by the teachers from the Bible to the children of the school, for the purpose of teaching morality, are read and taught as teachings from the inspired Word of God Himself.' To read the Bible for the purpose stated requires that it be read reverently and worship-fully. As God is the author of the Book, He is necessarily worshipped in the reading of it. And the reading of it forms part of all religious services in the Christian and Jewish churches, which use the Word. It is as much a part of the religious worship of the churches of the land as is the offering of prayer to God.
The general policy of the government always is to avoid with care any compulsion which infringes 'on the religious scruples of any, however little reason may seem to others to underlie them. Cooley, p. 585. The reading of the New Testament as the Word of God infringes on the religious scruples of the Jews. The discrimination against them, and the inequality of rights and privileges, are manifest by such requirement.
The subjection by school authorities of Jewish children to Christian worship is forbidden by the Constitution, which guarantees to every person the natural right to worship God according to the dictates of his conscience.
“Before the Constitution Jews and Gentiles are equal; by the law they must be treated alike; and the ordinance * * * which gives to one sect a privilege which it denies to another, violates both the Constitution and the law, and is therefore null and void.” Shreveport v. Levy, 26 La. Ann. 671.
It is a fact that the reading of the Bible is religious instruction, and that when the New Testament is read it is Christian instruction. The character of the Book is that it-is a pious one, and it is essentially religious. It is not adapted for use as a textbook for the teaching alone of reading, his *1049 tory, or of literature, without regard to its religious character. Such use would be inconsistent with the true character and the reverence in which the Scriptures are held, and should be held.
To permit the teacher to select the part of the Bible to be read without test whereby to determine the selection is to allow any part, or all parts, to be selected.
One of the most important forms of instruction is that of reading; and it is impossible to read from the New Testament without giving instructions in Christianity. It (the New Testament) is the foundation and text-book of Christianity, based on the teachings contained therein that Christ is divine. And the lessons therefrom give a perference to Christians, and at the same time make a discrimination against the Jews.
“The more enlightened opinion of the present day denies the duty [to teach religion in the public schools], and affirms that any step in that direction is in greater or less degree a species of persecution of those who are not favored, and therefore incompetent, in^any country whose political institutions are based upon the principles of equality before the law. Religious instruction is, therefore, referred exclusively to the voluntary action of the people.” Cooley on Taxation, 197.
The answer made by defendants that “in all of said schools the said teachers might with due propriety have excused from attendance on such exercises the children of said plaintiffs and others of similar belief, if so requested by the students or their parents or guardians,” is an admission of discrimination against the children of those citizens whose consciences would not permit them to worship God -as taught in the particular portion of the Scriptures selected and read by the teacher of the class in which the children of said citizens happened to be.
Under such circumstances, the children would be excused from the opening exercises of the school because of their religious beliefs. And excusing such children on religious grounds, although the number excused might be very small, would be a distinct preference in favor of the religious beliefs of the majority, and would work a discrimination against those who were excused. The exclusion of a pupil under such circumstances puts him in a class by himself; it subjects him to a religious stigma; and all because of his .religious belief. Equality in public education would be destroyed by such act, under a Constitution which seeks to establish equality and freedom in religious matters. The Constitution forbids that this shall be done.
It is therefore ordered, adjudged, and decreed that the judgment of the district court be annulled, avoided, and reversed.
It is further ordered, adjudged, and decreed that there be judgment in favor of plaintiffs and against defendants, enjoining the board of school directors of the parish of Caddo and the parish superintendent from enforcing or carrying into effect the resolution of said board requesting the principals and teachers to open the morning sessions of the public schools of Caddo parish by reading from the Bible, without note or comment, and the offering of the Lord’s Prayer. In all other respects the petition of plaintiffs is denied; defendants to pay costs in all courts.
LAND, J., recused on account of relationship to one of the parties.
PROVOSTY, J., concurs in the opinion, adding, however, that according to his understanding the objection of the Catholic Church to the popular reading of the Bible relates only to the Old Testament, owing to certain passages therein, the reading whereof' might do more harm than good to the uninstructed.