Barbara Marie GUILLORY and Pearlie Hardin Elloie, Plaintiffs,

v.

The ADMINISTRATORS OF the TU-LANE UNIVERSITY OF LOUISIANA, and Herbert E. Longenecker, President of Tulane University of Louisiana, and The Administrators of the Tulane Educational Fund, Defendants.

Civ. A. No. 11484–B.

United States District Court
E. D. Louisiana,
New Orleans Division.

March 28, 1962.

Pilie, Nelson & Limes, John P. Nelson, Jr., Katherine S. Wright, New Orleans, La., for plaintiffs.

Guste, Barnett & Little, John Pat Little, Wood Brown, III, New Orleans, La., for defendants.

J. SKELLY WRIGHT, District Judge.

■ The Tulane University of Louisiana, which now [1] regards itself as a "private" institution, refuses to admit qualified Negro applicants solely because of their race. A special Louisiana statute, Act 43 of 1884, LSA–R.S. Tit. 17, c. 6 note, enshrined in the state constitution, La.Const.1921, Art. 12, § 24, LSA,[2] apparently requires this discrimination.[3] But that law, and all such laws, must yield to the principle of equal treatment announced in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. The state can no more dictate discrimination in private institutions than it can segregate its own facilities. Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131; Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149; Gayle v. Browder, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, aff'g M.D.Ala., 142 F.Supp. 707; State Athletic Commission v. Dorsey, 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028, aff'g E.D.La., 168 F.Supp. 149. This principle is too well settled to permit of further debate. It is foreclosed as a litigable issue. Cf. Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512.[4]

■■ Nor do the white restrictions in some of the donations [5] to the University supply a constitutional basis for racial discrimination. Whatever effect they may have,[6] these conditions cannot affect the University's admissions policy.[7] Insofar as they would require exclusion of any racial group, they are judicially unenforceable. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161; Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586.[8]

1. As later noted, the administrators of Tulane did not always so maintain. See page 862, infra.

2. Act 43 of 1884 was expressly "ratified and approved" by a constitutional amendment approved April 17, 1888. See La.Const.1879, Art. 269, as added in 1888, LSA. Act 43 was also recognized in the intervening Louisiana Constitutions, La.Const.1898, Art. 255, LSA; La.Const.1913, Art. 256, LSA.

3. Act 43 does not openly restrict admission to white students. But it requires the new administrators of the University "to perpetually use the powers conferred by this act, and all power vested in them, for the purpose of creating and maintaining in the city of New Orleans a great University, devoted to the intellectual, moral and industrial education and advancement of the youth of this State, *under the terms of the donation of Paul Tulane*, and the previous provisions of this act." La.Act 43 of 1884, § 6 (emphasis added). And Tulane's gift was expressly limited to "white young persons." Thus, the restriction appears to have been brought in through the back door. This circumspect approach is not surprising when we remember that the Louisiana Constitution of 1868 expressly prohibited racial discrimination in education, Art. 135, and the Constitution of 1879, in effect in 1884, merely avoided the issue.

4. Bailey holds that no statutory court of three judges need be convened "when, as here, prior decisions make frivolous any claim that a state statute on its face is not unconstitutional." Id., at 33, 82 S.Ct. 551. The same decision also confirms this court's refusal to abstain under the circumstances.

5. It appears that the only gifts so restricted are those of Paul Tulane and one by Mrs. Newcomb, totalling less than $1,000,000.

6. Whether non-compliance with the condition would support an action for recision of the donations is a state law question which this court need not decide.

7. Neither the regulations of the University nor the charter of the Tulane Educational Fund seem to require exclusion of Negroes. But, whether or not the state courts ultimately determine that Tulane is bound by the restrictions in the donations it has accepted, the University cannot constitutionally be compelled to honor racially discriminatory conditions.

8. The Equal Protection Clause of the Fourteenth Amendment inhibits state judicial action only. But the same restraint operates on the federal courts under the Due Process Clause of the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884.

Where, then, is the obstacle to the admission of these plaintiffs and others similarly situated? Having concluded that the only legal support for segregation has fallen, the court might summarily order desegregation of the institution. Cf. Gayle v. Browder, supra; Morrison v. Davis, 5 Cir., 252 F.2d 102. Especially so, in view of Tulane's official declaration that it would admit Negroes "if it were legally permissible" to do so.[9] But the argument is now advanced that the University, because of its private status, is immune from the command of the Fourteenth Amendment under the doctrine of the Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. The importance of this issue invites serious consideration.

Tulane argues that, even if there is no valid state law requiring segregation, it remains free to discriminate in admissions as it chooses. That proposition, of course, supposes that the acts of the University cannot be imputed to the state, but are entirely private deeds, exempt from the Equal Protection Clause.

At the outset, one may question whether any school or college can ever be so "private" as to escape the reach of the Fourteenth Amendment. In a country dedicated to the creed that education is the only "sure foundation * * of freedom," [10] "without which no republic can maintain itself in strength,"[11] institutions of learning are not things of purely private concern. The Supreme Court of the United States has noted that "[i]n these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." Brown v. Board of Education of Topeka, supra, 347 U.S. 493, 74 S.Ct. 691, 98 L.Ed. 873. And, with less restraint, the Louisiana Supreme Court has said: "Education insures domestic tranquility, provides for the common defense, promotes the general welfare, and it secures the blessings of liberty to ourselves and our posterity." Herold v. Parish Board of School Directors, 136 La. 1034, 68 So. 116, 119, L.R.A.1915D, 941. No one any longer doubts that education is a matter affected with the greatest public interest. And

---

9. On March 8, 1961, the president of the Board "called attention to the denials by the Foundations of [Tulane's] applications for help and stated that, in his judgment, these denials were prompted solely by [its] admissions policy." After discussion, the Board determined to "recognize that it is incumbent upon it, to the extent that it legally can, to change the admissions policy, which on a controlled basis, would permit the admission of any qualified student to attend any college of the University." At the next meeting, April 12, 1961, it was formally announced that: "The Administrators of the Tulane Educational Fund met Wednesday and voted that Tulane University would admit qualified students regardless of race or color if it were legally permissible."

Needless to say, the instant decision offers no justification for a policy of admitting qualified Negro applicants "on a controlled basis." The considerations justifying delay in the full implementation of desegregation orders in primary and secondary education do not apply to collegiate education, graduate, Hawkins, State of Fla. ex rel. v. Board of Control,

350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486, or undergraduate, Lucy v. Adams, 350 U.S. 1, 76 S.Ct. 33, 100 L.Ed. 3; Board of Supervisors of La. State U., etc. v. Tureaud, 5 Cir., 225 F.2d 434, opinion reinstated, 228 F.2d 895; Ludley v. Board of Supervisors of L. S. U., E.D. La., 150 F.Supp. 900, aff'd, 5 Cir., 252 F. 2d 372.

10. Jefferson, letter to Whythe, August 13, 1786, in I Writings (Bergh ed., 1907), p. 396.

11. Jefferson, letter to Governor John Tyler, May 26, 1810, in XII Writings, p. 393.

The State of Louisiana was, from the first, dedicated to the same view. Her first American governor, Claiborne, was a strong advocate of education and repeatedly attempted to establish a comprehensive system of public schools. See I Official Letter Books of W. C. C. Claiborne (Rowland ed., 1917), pp. 100, 238, 327, 346; III id., pp. 111, 277-278; V id., pp. 125-126, 259; VI id., pp. 143-144; Riley, The Development of Education in Louisiana Prior to Statehood, in 19 La. Hist.Quarterly 595, 624 ff.

this is true whether it is offered by a public or private institution. Cochran v. La. State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913; Everson v. Board of Education, 330 U.S. 1, 7, 67 S.Ct. 504, 91 L.Ed. 711. Clearly, the administrators of a private college are performing a public function. They do the work of the state, often in the place of the state.[12] Does it not follow that they stand in the state's shoes? And, if so, are they not then agents of the state, subject to the constitutional restraints on governmental action, to the same extent as private persons who govern a company town, Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, or control a political party, Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152, or run a city street car and bus service, Public Utilities Comm. v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068; Boman v. Birmingham Transit Company, 5 Cir., 280 F.2d 531, or operate a train terminal, Baldwin v. Morgan, 5 Cir., 287 F.2d 750?[13]

■ Reason and authority strongly suggest that the Constitution never sanctions racial discrimination in our schools and colleges, no matter how "private" they may claim to be. But the special circumstances of this case do not require us to go so far. Under the present facts, we need only apply the teaching of the cases[14] that private ownership or operation of a facility impressed with a public interest does not automatically insulate it from the reach of the Fourteenth Amendment. A review of its history and an analysis of its actual state connections will sufficiently disclose that Tulane University is answerable to the Constitution.

Significantly, the history of Tulane begins with a wholly public college, the University of Louisiana. Organized in 1847,[15] that institution had developed into a respectable center of learning by 1880.[16] Established under constitutional

12. Mr. Justice Frankfurter has noted that "[t]he need for higher education and the duty of the state to provide it as part of a public educational system, are part of the democratic faith of most of our states." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 656, 63 S.Ct. 1178, 1194, 87 L.Ed. 1628 (dissenting opinion).

13. Insofar as the majority opinion in the Civil Rights Cases, supra, indicates a different doctrine, it appears to have given way to the dissenting view of the first Mr. Justice Harlan, id., 109 U.S. at 57 ff., 3 S.Ct. at 54 much as his opinion in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, has ultimately prevailed.

14. In addition to the pre-cited cases in the text, see Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984; Muir v. Louisville Park Theatrical Association, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112, reversing and remanding, 6 Cir., 202 F. 2d 275; Com. of Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792; Cooper v. Aaron, 358 U.S. 1, 17, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5; Burton v. Wilmington Parking Auth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45; Kerr v. Enoch Pratt Free Library of Baltimore City, 4 Cir., 149 F.2d 212; Department of Conservation & Development, Division of Parks, Com. of Va. v. Tate, 4 Cir., 231 F.2d 615; City of St. Petersburg v. Alsup, 5 Cir., 238 F.2d 830; Derrington v. Plummer, 5 Cir., 240 F.2d 922; City of Greensboro v. Simkins, 4 Cir., 246 F. 2d 425; Lawrence v. Hancock, S.D.W. Va., 76 F.Supp. 1004; Jones v. Marva Theatres, Inc., D.Md., 180 F.Supp. 49; Coke v. City of Atlanta, Ga., N.D.Ga., 184 F.Supp. 579. See also Valle v. Stengel, 3 Cir., 176 F.2d 697.

15. Actually, Tulane traces its pedigree back to 1834 when "seven young physicians banded together" to form the Medical College of Louisiana. The Louisiana Constitution of 1845, arts. 137–139, provided for the establishment of the University, assimilating the Medical College, and the Legislature executed its mandate in 1847. La.Act 49 of 1847.

16. Edward Douglas White, one of Tulane's original administrators (and later Chief Justice of the United States), described the University of Louisiana in 1883 as "established for many years with an able and successful medical faculty, with a law faculty already in being and with an academical department in infant life, which seems to present a fair hope of success."

mandate,[17] and protected by express provision in the new Louisiana Constitution,[18] it was a going concern, enjoying a substantial annual appropriation from the Legislature [19] and possessing real property of considerable value.[20] It was the only college or university in New Orleans when Paul Tulane established his educational foundation.

In 1881, Mr. Tulane, a former resident of the city, announced his intention to donate about a million dollars for educational purposes. After much discussion and re-drafting, during which he was apparently persuaded to restrict the recipients of his bounty to "white young persons," [21] Paul Tulane formalized his purpose in May, 1882, in a letter to the prospective administrators of the "Fund" he was creating. Promptly, these seventeen gentlemen [22] formed a corporation "with a view of carrying out the wishes,

intentions and suggestions of Paul Tulane, Esq." as set forth in his "letter of intent" to them, and the donations followed.[23] While much was left to their discretion, the administrators of the Tulane Educational Fund were directed to "establish or foster institutions of a higher grade of learning" "in the city of New Orleans." There were only two choices: start a brand new school or build up the existing University of Louisiana. The inadequacy of their funds to endow a substantial institution, the advantages of working with an operating facility, and reluctance to compete with an established university, already counselled the second course. But, whatever doubts remained, the decision to foster the state university was won when it became clear that there lay the only hope of securing full tax exemption for the Fund's property,[24] a matter of great im-

17. La.Const.1845, Arts. 137–139.

18. La.Const.1879, Art. 230. See also, La. Const.1852, Arts. 139, 140.

19. For some years, the University had received an annual subsidy of $10,000, the maximum permitted under the constitutional provision. See La.Const.1879, Art. 230.

20. The inventory executed in compliance with Act 43 of 1884 appraises the real estate then owned by the University of Louisiana at $152,436.48. A year earlier, however, Edward Douglas White thought the value of that property "might be safely said to exceed $300,000."

21. Senator Gibson, who was later to become president of the Board of Administrators of the University, claims credit for convincing Mr. Tulane to abandon his earlier inclination to be less discriminating. It is also interesting to note that the Tulane Board apparently interprets "white young persons" to include persons of any age and of any color except black. Students of all ages and races, except Negro, have long been admitted by the University.

22. The orginal administrators, all but one of whom later served as members of the governing body of Tulane University, were: Randall L. Gibson, Charles E. Fenner, James McConnell, T. G. Richardson, M.D., Edward White, E. H. Farrar, P. N. Strong, B. M. Palmer, D.D., Hugh

Miller Thompson, D.D., Charles A. Whitney, Samuel H. Kennedy, Walter Stauffer, Cartwright Eustis, Henry Ginder, John T. Hardie, R. M. Walmsley, and William O. Rogers.

23. While Paul Tulane gave handsomely, it was apparently anticipated that he would effect still further donations. The Louisiana Supreme Court so indicates in the following ornate passage from its opinion of 1886: "We felicitate ourselves that the way to this consummation has been timely cut by the Legislature so that the stream of Paul Tulane's bounty shall flow on undiminished, while the children of our State through successive generations shall 'rise and call him blessed.' " Administrators of Tulane Ed. Fund v. Board of Assessors, 38 La.Ann. 292, 298. See also the third recital in the preamble of La.Act 43 of 1884. Hence, perhaps, the concern for satisfying Mr. Tulane even after the initial donations had been completed.

24. In 1883 the state Supreme Court had refused to exempt the Tulane Fund's property, even though its revenues were dedicated to the cause of education. State ex rel. Board of Administrators Tulane Ed. Fund v. Board of Assessors, 35 La.Ann. 668. Accordingly, the only remaining hope for the exemption was in dedication of the revenues not to "education" generally, but to a particular state institution, on the theory that the property would thereby acquire the special

portance to Mr. Tulane. It remained only to find a way to secure control of the University of Louisiana and allay Paul Tulane's fear of an institution subject to political control.

A plan was devised which, in the words of the new president, offered "all the benefits of a State institution without any of the dangers." The Tulane Fund was to dedicate all its revenues to the support of the University, and the state would be relieved of its obligation to make annual appropriations. In return, the school would be re-christened "The Tulane University of Louisiana" in honor of its new benefactor, and the administrators of his Educational Fund were to obtain majority representation on the governing board of the institution, which, however, would still include three public officials,[25] the Governor, the State Superintendent of Education and the Mayor of New Orleans.[26] Finally, the Fund's property was to enjoy full ex-

emption from taxation. This proposal was incorporated in Act 43 of 1884, and upon the Governor's approval of the measure, the new regime began.

It is conceded that Act 43 did not, of itself, create a new institution, or convert the old state university into a private school. The University of Louisiana continued, operating in the same buildings, on state lands,[27] enjoying the same rights and franchises. Neither the substantial private support it now received nor its new governing body changed the character of the institution as a public college. On the contrary, the property of the Tulane Fund, a private corporation, because it was dedicated to the support of a state institution, now enjoyed the tax immunity of "public property." Such was the unanimous opinion of the Louisiana Supreme Court in 1886, when it confirmed the unique exemption from taxation[28] and unequivocally declared Tulane University, as then exist-

---

immunity accorded "public property." See La.Const.1879, Art. 207. Such, indeed, was the subsequent ruling of the Louisiana Supreme Court in Administrators of Tulane Ed. Fund v. Board of Assessors, supra.

25. The governing board of the University of Louisiana, before 1884, likewise included three ex-officio members. Now the State Superintendent of Education was substituted for the Chief Justice of the State Supreme Court. See La.R.S.1870, § 1351, LSA–R.S. Tit. 17, c. 6 note.

26. A dispute rages as to whether the three public officials are members of the Board of Administrators of the Tulane Educational Fund, which, as such, is the governing body of the University, or whether there is a separate board, composed of the same twenty persons, styled The Board of Administrators of the Tulane University of Louisiana. But, whatever the importance of that knotty question in a different context, it does not affect the result here. Without resolving the issue, the court will deny the motion to quash and dismiss filed on behalf of the latter Board on the theory that there is no harm done by retaining a body which says it does not exist. Since both boards are made defendants, and one of them admittedly governs the University, it is sufficiently clear that the

injunction operates against whatever body actually controls the admissions policy of Tulane.

27. Defendants maintain that the Tulane Educational Fund actually obtained title to the state property used by the University of Louisiana, subject to reversion in the event the revenues thereof ceased to be devoted to University purposes. Plaintiffs say "control" only was transferred, title being retained by the state. But, since the power to alienate the particular property in question was expressly made subject to legislative sanction, and considering that, even if owned by the Fund, it acquired the character of "public property" (like all other real estate of the Fund which the University enjoys directly or indirectly), the practical difference is not appreciable. In the constitutional view, at least, the distinction is unimportant. Constitutional rights "are not inevitably measurable in terms of ancient niceties of * * * real property law." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734. See also, Jones v. United States, 362 U.S. 257, 266–267, 80 S.Ct. 725, 4 L.Ed.2d 697; Chapman v. United States, 365 U.S. 610, 617, 81 S. Ct. 776, 5 L.Ed.2d 828.

28. Then, as now, property actually used for educational purposes enjoyed exemp-

ing, "a public institution." Administrators of Tulane Ed. Fund v. Board of Assessors, supra. But, if Tulane did not become private by the Act of 1884, when was the metamorphosis accomplished?

We are told that adoption of the constitutional amendment of 1888, ratifying Act 43, worked the change. Certainly nothing in the wording of the amendment justifies the claim. It merely says that Act 43 is "hereby ratified and approved" and supersedes any prior inconsistent constitutional provision. La. Const.1879, Art. 269, as added in 1888. But it is argued that the Act of 1884 itself contemplates the birth of a wholly new institution by providing that the board, "besides the powers designated by this act," shall "upon the adoption of said Constitutional Amendment" have "full power * * * to create and develop a great University in the city of New Orleans * * *." La.Act 43 of 1884, § 4. See also, id., § 6. The contention is apparently that, upon the approval of the amendment in 1888, a new private school sprang into existence and all connections with the former state institution were severed.[29]

This is patent nonsense. Tulane was no different after the electors had recorded their vote. Whatever additional powers the administrators now acquired, they did not exercise them, except by gradually adding new faculties to the three already established. And this is probably all that was intended. The explanation is given by the Tulane Board itself, speaking through its president, Charles E. Fenner, a former justice of the Louisiana Supreme Court. In 1906 he wrote:

"The Constitution of 1879 contained the following provision, Article 230:

" 'The University of Louisiana, as at present established and located at New Orleans, is hereby recognized in its three departments, to-wit: the Law, the Medical and the Academical Departments, to be governed and controlled by appropriate faculties.'

"It was in view of this restricted constitution of the University, as then organized under the statutes and recognized in the Constitution, that the Administrators were given authority and bound themselves, upon the adoption of the Act as a constitutional amendment, 'to perpetually use the powers conferred by this Act, and all power vested in them, for the purpose of creating and maintaining a great University in the City of New Orleans,' the obvious purpose being to emancipate them from all restrictions as to the existing organization of the University and the number and kinds of departments of which it should be composed, and to give them authority to transform and create the existing University into a great University having all such departments and faculties as the Administrators might see fit to establish.

"This is the authority under which, since the adoption of the Constitutional Amendment, the Administrators have added to then exist-

tion from ad valorem taxes, but the immunity did not extend to property commercially leased, though all revenues were contributed to education. See State ex rel. Board of Administrators Tulane Ed. Fund v. Board of Assessors, supra; La.Const.1921, Art. 10, § 4(2).

29. The ambiguous language of subsequent constitutional provisions dealing with Tulane is invoked in support of this view.

See La.Const.1898, Art. 255; La.Const. 1913, Art. 256; La.Const.1921, Art. 12, § 24. But, at most, those provisions merely say that Tulane University was "created" by the Act of 1884, which, in a sense, is true. Nothing there intimates that the University changed character in 1888, or that it ceased to be a public institution. On the contrary, the provision, in each instance, is included under the rubric "Public Education."

ing departments, the Woman's Department, thus utilizing the great gift of Mrs. Newcomb, and the University Department for post-graduates; but these, like all the others, are mere departments of the Tulane University of Louisiana, which is, and remains the University of Louisiana established by the State in 1847." Fenner, The Tulane University of Louisiana: An Account of a Stewardship, pp. 4, 5.

No one suggests that the removal of the University from its old quarters to the uptown campus at the turn of the century effected a change. Nor can any such implication be read into Act 94 of 1890, LSA–R.S. Tit. 17, c. 6 note, which authorized the sale or lease of the old properties with a view to relocation. On the contrary, that statute, conditioning all transactions upon the Governor's approval and expressly requiring the revenues to be expended for the University, emphasizes the state's continuing interest in the institution. The fact is that as late as 1906, after the University had entirely vacated the old buildings, the Tulane Board, without dissent, so far as appears, considered their school a state institution. Judge Fenner stated the Board's position emphatically in his 1906 report:

"No one can read the Constitution of the State, the Legislative Acts and the judicial decisions bearing on the subject without perceiving that the Tulane University of Louisiana is nothing more nor less than the University of Louisiana established by the State in 1847, continued under a slight change of name and under control of Administrators appointed in a different way from that formerly pursued, but deriving their authority directly from the State.

\* \* \* \* \* \*

"Upon what grounds it can be claimed that such an institution is not a public educational institution of the State is more than we can conceive." Fenner, op. cit. supra, pp. 1, 7.

█ We are naturally curious to know what happened more recently to justify the claim that Tulane is no longer a state school. But nothing is pointed out. The Legislature has not acted to transform the University into a private institution. Quite the opposite. As recently as 1944, it instructed Tulane to grant its scholarships to designees of legislators "without making any distinction as to sex,"[30] thereby, in effect, compelling the University to open its doors to female students, a directive more appropriately addressed to a public institution than one wholly independent of the state. Nor have the Louisiana courts retreated from their opinion of 1886.[31] The complete history of Tulane University indicates that it is now, as it always was, a public institution.

But even if, by some strange alchemy, time alone has so transformed the University that it can now be said to be, as a matter of local law, a private enterprise, that does not alter the result. For, history to one side, the present involvement of the state is sufficient to subject Tulane to the constitutional restraints on governmental action. Indeed, the University still operates under a special legislative franchise; it continues to enjoy a very substantial state subsidy in the form of a unique tax exemption for commercially leased property;[32] it still receives considerable revenues from lands which the state has not altogether relinquished;[33] and three public officials

---

30. La.Act 308 of 1944, LSA–R.S. Tit. 17, c. 6 note.

31. Neither the decision nor the opinion in State v. Board of Adm'rs, 125 La. 432, 51 So. 483, is to the contrary. It is there said that the Tulane Educational Fund is a private corporation, but the court does not so characterize the University itself.

32. Defendants themselves estimate the value of this exemption at $196,122.50 annually.

33. As already indicated, even if title to the former University of Louisiana property

remain on its governing board.[34]  Clearly, it falls within the rule of Cooper v. Aaron, supra, 358 U.S. 19, 78 S.Ct. 1410, that "State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command * * *."[35]  The consequence is that Tulane University cannot discriminate in admissions on the basis of race.

█ This case has overtones of litigation designed to rescue the University from the unfavorable position in which it now finds itself, particularly with respect to large foundations created to dispense funds to institutions of higher learning.[36]  The statement of the Board indicating that it "would admit qualified students regardless of race or color if it were legally permissible" supports this suggestion.  On all the evidence, however, this court cannot say with assurance that this suit is, in fact, a "friendly" proceeding.[37]  This court would be reluctant to so hold.  The bitter fruit of the Board's segregation policy of the past should not be visited on the young men and women of the future, of all races, who seek admission to the University.

Plaintiffs' motion for summary judgment is granted.

---

is now in the Tulane Board, the state retains reversion rights.  Moreover, even under the 1942 amendment to Act 94 of 1890. supra, no sale of that property can be effected without the Governor's approval.  Act 76 of 1942, LSA–R.S. Tit. 17, c. 6 note.

34. It is argued that the public officials have practically abandoned their right to participate in the governance of the University.  But the state cannot so easily divorce itself from its connection.  "[N]o state may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be."  Burton v. Wilmington Parking Auth., supra, 365 U.S. 725, 81 S.Ct. 682, 6 L.Ed.2d 45.  See also

Terry v. Adams, supra, 345 U.S. 469, 73 S.Ct. 809, 97 L.Ed. 1152 (opinion of Mr. Justice Black).

35. See also Kerr v. Enoch Pratt Free Library of Baltimore City, supra.  Insofar as Eaton v. Board of Managers of James Walker Mem. Hosp., 4 Cir., 261 F. 2d 521, indicates a different rule, it must, of course, give way, at least in the area of education.

36. See note 9, supra.

37. Since so-called "friendly suits" offend the adversary principle of the judicial process, they must be dismissed on the court's own motion.  United States v. Johnson, 319 U.S. 302, 304–305, 63 S.Ct. 1075, 87 L.Ed. 1413.